Argued and submitted February 12, affirmed May 27, 1998

## T. Dan WOLLAM,
an individual,
*Appellant,*

*v.*

## William D. BRANDT,
an individual;
and Ferder, Brandt & Casebeer,
an Oregon partnership,
*Respondents,*

*and*

## Deborah K. CATHERS;
Richard Powell, individually;
Chehalem Youth and Family Services;
and Friends of Chehalem House, Inc.,
Oregon non-profit corporations,
*Defendants.*

(CV95-314; CA A94122)

961 P2d 219

Roger Hennagin argued the cause and filed the briefs for appellant.

G. Kenneth Shiroishi argued the cause for respondents. With him on the brief was Dunn, Carney, Allen, Higgins & Tongue.

Before Warren, Presiding Judge, and Armstrong and Linder, Judges.

ARMSTRONG, J.

**ARMSTRONG, J.**

Plaintiff appeals the grant of summary judgment to defendant Brandt in an action stemming from an employment dispute. Plaintiff initially brought the action against Brandt, Brandt's law firm,[1] Deborah Cathers, Richard Powell, Chehalem Youth and Family Services (CYFS) and Friends of Chehalem House, Inc. Brandt moved for summary judgment as to the counts against him—invasion of privacy, interference with contract and defamation—on the ground that the act on which those counts were based was absolutely privileged. Following the trial court's grant of summary judgment to Brandt, plaintiff settled his outstanding claims against the remaining defendants and the case was dismissed. On appeal, the only issue is the grant of summary judgment to Brandt.

On review of summary judgment, we review the facts in the light most favorable to the nonmoving party to determine if the movant is entitled to judgment as a matter of law. *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997). The facts of this case, as contained in the record on summary judgment, are as follows. Plaintiff was employed in March 1994 as an administrator by CYFS, a nonprofit, church-based service provider in Yamhill County. In September 1994, he was named director of finance for CYFS. At all times pertinent to this action, he was supervised by defendant Cathers, who was the executive director of CYFS. Throughout his tenure at CYFS, plaintiff had expressed concern over what he saw as mismanagement by Cathers. In particular, plaintiff had been upset that Cathers appeared to be mismanaging funds received as a grant from the Yamhill County United Way. He had discussed his concerns with fellow employees and with members of the CYFS board of directors. On January 4, 1995, Cathers terminated plaintiff's employment, citing, among other things, plaintiff's failure to cooperate with Cathers in her management of the agency. Earlier that day, plaintiff had requested a formal grievance

---

[1] Because the claims against Brandt as an individual and against Brandt's law firm, Ferder, Brandt and Casebeer as an entity, involve the same issues and were resolved in the same manner by the trial court's grant of summary judgment, references to Brandt are also references to his firm.

hearing, to be held by Christian Conciliation Service, on his conflict with Cathers. CYFS had an established grievance procedure, but plaintiff believed that a CYFS procedure would be inherently flawed because of Cathers' position at the agency. Plaintiff believed that his firing was in retaliation for his grievance and because he had refused to participate in practices that he believed to be questionable or illegal.

On January 25, 1995, plaintiff filed an affidavit with the Newberg Police Department in which he stated that he believed that Cathers had submitted false information to the United Way in an application for additional funds. He told the police that he believed that Cathers had stated in the application that an earlier grant had been used for a specific purpose when, in fact, it had not. Plaintiff believed that Cathers had made this statement so that CYFS would not be asked to return the money to the United Way. On the basis of that affidavit, the Newberg police obtained a warrant and searched Cathers' home and office for evidence of the alleged fraud.

On February 2, 1995, plaintiff's attorney wrote a letter to the CYFS board of directors, stating that plaintiff believed that he had been discharged wrongfully and that he hoped to resolve the issue without having to resort to litigation. In response to plaintiff's complaint and in light of the police investigation, the CYFS Board held a special meeting on February 7, 1995, at which it reinstated plaintiff, placed both plaintiff and Cathers on paid administrative leave, and retained a local attorney, Ronald Stone, to investigate plaintiff's allegations against Cathers. On February 8, 1995, Brandt wrote a letter to the board, reminding it that Cathers had retained him to represent her in any civil or criminal matter arising out of plaintiff's accusations and informing it that Cathers believed that the board had acted improperly and illegally in placing her on leave. In the letter, Brandt stated that "there is a very strong possibility that legal action will ensue."

As part of his investigation, Stone interviewed Cathers. On March 6, 1995, Stone sent Brandt copies of the interview transcript and, in an accompanying letter, stated: "At this point I don't know whether I will need to speak to

your client further. * * * In the meantime, if you or your client have anything to add, please don't hesitate to call or write." On March 14, Brandt wrote a letter to Stone in which he stated that he had some information about plaintiff that he believed Stone should know. Brandt told Stone that he had sent an investigator to plaintiff's previous employer and had discovered that plaintiff had made false representations to the Board and to Cathers when he applied to work for CYFS.[2]

---

[2] Brandt's letter was as follows:

"March 14, 1995

"Ronald W. Stone
HAUGEBERG RUETER STONE
PO Box 480
McMinnville OR 97128
"RE: Cathers/Chehalem House

"Dear Mr. Stone:

"I thought you should be made aware of some information we have uncovered regarding Dan Wollam. He was employed from January 1992 until September 1993 with Western Evangelical Seminary (WES). I would suggest you talk to David Jeffrey, Executive Vice President for Administration Advancement at WES. His phone number is 639-0559.

"I have learned that Wollam was hired along with a Dan Berg and Gary Randall by the current President of WES, Dr. David C. LeShana in January 1992. Mr. Jeffrey came on board at WES shortly after that time. All four individuals worked for Dr. LeShana at Seattle at Pacific University. Jeffrey indicates that Wollam, Berg and Randall *were asked to resign by WES Board of Directors* for the reason that although they were hand picked by WES to help pull WES out of the financial crisis that WES was experiencing, they were unable to deal with that financial crisis. Accordingly, it was determined by the Board of Directors that they should be terminated.

"It is my understanding that Mr. Wollam falsely represented to the Chehalem Board and Ms. Cathers that he had voluntarily resigned from WES.

"Mr. Jeffrey also commented with respect to Mr. Wollam's resume. However he indicated that the resume, in general terms, was accurate and was inaccurate in these specifics:

"1. He did not have direct responsibility for government relations. Indeed, WES had nothing to do with governmental relations. This misrepresentation would be critical because Wollam convinced Ms. Cathers and the Board that he could help with the Medicaid application.

"2. Wollam stated that he had direct responsibility for legal affairs. Mr. Jeffrey will state that *this statement is false and that Wollam had no responsibility* for legal affairs.

"3. Mr. Jeffrey stated that Wollam liked to convey the impression that he was a lawyer and legally trained.

"4. Mr. Jeffrey stated that Mr. Wollam's responsibilities at WES involved nothing more than obtaining information from different department heads and reporting that information to the president.

"5. Mr. Jeffrey indicated that Mr. Wollam had a high school diploma.

A grand jury was convened to investigate the criminal charges against Cathers, but it did not return an indictment. Following Stone's investigation, Cathers was reinstated as executive director of CYFS. Plaintiff then instituted this action against Cathers, Brandt and the other defendants, claiming, among other things, that he had been punished for blowing the whistle on Cathers' illegal activities. In the claims specific to Brandt, plaintiff alleged that the March 14 letter from Brandt to Stone was defamatory and that Brandt knew at the time that he sent the letter that the allegations in it were false. The invasion of privacy and interference with contract claims were also based on the allegedly defamatory letter.

Brandt moved for summary judgment on the ground that the letter had been written in the course of judicial proceedings involving his client and, as such, was privileged. In response, plaintiff argued that the letter was not privileged, because it was not written as part of a judicial or quasi-judicial proceeding. In the alternative, plaintiff argued that absolute privilege for statements made in a judicial proceeding is an anachronistic rule that allows attorneys to subvert justice and, hence, is a rule that the trial court should reject. Plaintiff also offered affidavits from Jeffrey and LeShana that stated that Brandt had misrepresented their statements about plaintiff.[3]

---

"Mr. Jeffrey indicated that Mr. Wollam was quite astute at picking up on certain individuals who are decision makers and basically incurring their favor.

"Mr. Jeffrey is aware of the situation in Newberg and Chehalem House. He is aware that Mr. Wollam and Mr. Russell are close friends and that it would be typical of him to 'go after' Ms. Cathers through Russell through body language, facial expressions, rolling eyes, shaking his head, etc., but not directly.

"I felt this material might be important to you and the board, particularly with respect to a threatened wrongful termination suit.

"I look forward to your conclusions." (Emphasis in original.)

[3] Brandt argues that plaintiff withdrew the affidavits from the summary judgment record. Our reading of the colloquy between the court and plaintiff's attorney leads us to conclude that plaintiff did not withdraw the affidavits but did concede that they were irrelevant to the issue of absolute privilege, which was the only issue before the court. In his opening brief and at oral argument, plaintiff urged this court to decide whether the trial court erred in not finding that Brandt's letter was subject only to a qualified privilege and that that privilege was lost because the letter was written with malice. Plaintiff did not make this argument to the trial court and it was not part of the trial court's decision. Accordingly, we decline to address it. ORAP 5.45(2).

The dispositive issue here is whether the letter from Brandt to Stone was absolutely privileged.[4] Brandt argues that the defamatory statements were made as part of a judicial or quasi-judicial proceeding. "Statements that are made as part of judicial and quasi-judicial proceedings are absolutely privileged." *Wallulis v. Dymowski*, 323 Or 337, 348, 918 P2d 755 (1996).[5] If the absolute privilege applies, the speaker is protected even if the speaker knew that the statements were false at the time they were made.

> "The absolute privilege to publish defamatory matter under the circumstances to which the privilege applies is based upon the ground that 'there are certain relations of life in which it is so important that the persons engaged in them should be able to speak freely that the law takes the risk of their abusing the occasion and speaking maliciously as well as untruly, and in order that their duties may be carried on freely and without fear of any action being brought against them, it says: "We will treat as absolutely privileged any statement made in the performance of these duties." ' "

*Ramstead v. Morgan*, 219 Or 383, 387, 347 P2d 594 (1959) (quoting *Moore v. Weaver*, 2 KB 520, 521 (1928)). Statements made by an attorney in advance of proposed judicial or quasi-judicial proceedings are also absolutely privileged. *See Troutman v. Erlandson*, 286 Or 3, 7, 593 P2d 793 (1979). The privilege is based upon "a public policy of securing to attorneys * * * the utmost freedom in their efforts to secure justice for their clients." *Restatement (Second) of Torts* § 586 comment *a*, (quoted with approval in *Chard v. Galton*, 277 Or 109, 112, 559 P2d 1280 (1977)). In order for the privilege to apply, the defamatory matter must have some reference to the subject matter of the pending litigation. In other words, it must be "pertinent and relevant to the issues, although it

---

[4] Brandt has conceded that if absolute privilege does not apply so that he is entitled to summary judgment as a matter of law, then there are genuine issues of material fact as to whether the letter defamed Wollam and whether Brandt was entitled to a qualified or conditional privilege.

[5] The absolute privilege applies not only to defamation actions, but to any tort action based on statements made in connection with a judicial proceeding. *See, e.g., Franson v. Radich*, 84 Or App 715, 719, 735 P2d 632 (1987) (privilege extends to claims for intentional infliction of emotional distress and invasion of privacy); *Lee v. Nash*, 65 Or App 538, 542, 671 P2d 703 (1983), *rev den* 296 Or 253 (1984) (privilege extends to "false light" claims for invasion of privacy).

may be false and malicious." *Irwin v. Ashurst,* 158 Or 61, 68, 74 P2d 1127 (1938).

> "In determining whether the argument was pertinent or relevant to the issues, courts are liberal and the privilege * * * embraces anything that may possibly be pertinent. All doubts should be resolved in favor of its relevancy and pertinency."

*Id.* at 70 (internal quotation marks omitted). That liberal standard applies to statements made in advance of litigation as well as to statements made in court. *Chard,* 277 Or at 113 (privilege applied to statements in letter from attorney to insurance company urging settlement of clients' claims). As the court in *Chard* reasoned, the test was not whether the defamatory statements would have been admissible at trial but, rather, whether they would have sufficient tangential relevance to affect the value of a settlement. *Id.* at 115.

█  Brandt offers four possible situations in which we could find that his letter was written in the course of judicial or quasi-judicial proceedings: (1) an action for wrongful discharge by Cathers against CYFS; (2) an action for wrongful discharge by plaintiff against CYFS; (3) possible criminal charges against Cathers; and (4) the investigation by Stone itself, as part of a CYFS internal grievance procedure. We conclude that the possible employment actions by Cathers and plaintiff constituted proposed judicial proceedings sufficient to shield Brandt's statements from plaintiff's claims.[6]

Cathers had hired Brandt to represent her in any civil or criminal actions that might arise as a result of plaintiff's complaints to the police and to the CYFS board. Stone had been retained by the board to investigate plaintiff's allegations against Cathers. Both Cathers and plaintiff had informed the board and Stone that they were considering legal action in response to the board's decisions on their

---

[6] Because we conclude that Brandt's statements were made in anticipation of the possible employment actions, we need not decide whether CYFS's internal procedures constitute the type of quasi-judicial proceedings contemplated by *Ramstead.* Nor must we determine whether Stone's investigation was sufficiently connected to any potential criminal charges against Cathers for Brandt's statements to be shielded.

employment. Brandt had written to the board on behalf of Cathers, protesting the board's action in placing Cathers on administrative leave. In the letter, Brandt had stated that the board had acted illegally and, by doing so, had damaged Cathers' reputation in the community. Brandt further had stated that "there is a very strong possibility that legal action will ensue." Earlier that week, plaintiff's attorney also had written to the board, stating that plaintiff had been discharged wrongfully and alluding to the possibility that plaintiff might take legal action. It is clear that any action taken by Cathers, plaintiff or the board would have been based in part on Stone's investigation. Cathers, as executive director of CYFS, would, of necessity, be directly involved in any legal action, either as a party or as a witness.

We conclude that the situation in this case is not unlike that in *Chard*, where legal action had not yet been brought but was a distinct possibility if the parties were not able to reach a settlement. Here it is clear that Cathers was willing to sue CYFS if it did not reinstate her to her position as executive director. It also is clear that plaintiff was contemplating legal action if his grievances were not resolved. Plaintiff's credibility before the CYFS investigator had a more than tangential relevance to those possible judicial proceedings. Accordingly, a letter from Brandt in his role as Cathers' attorney to the CYFS investigator, in which Brandt challenged plaintiff's credibility, was pertinent to potential litigation and was, therefore, absolutely privileged.

■　　　Although we conclude that the trial court was correct that the defamatory statements were made in the course of a judicial proceeding, plaintiff nevertheless argues that the trial court erred when it did not rule that "the privilege asserted is an anachronism and should be restricted or narrowed in light of evolving codes of lawyers' ethics." The doctrine of absolute privilege is well-established in our law and serves an important purpose. It secures to attorneys the utmost freedom in their efforts to secure justice for their clients. The Oregon Supreme Court has upheld the application of absolute privilege for statements made in the course of judicial proceedings as recently as 1996. *See Wallulis*, 323 Or

at 348. The trial court did not err when it refused plaintiff's invitation to hold differently.

Affirmed.