Argued and submitted July 17, award of attorney fees reversed; award of enhanced prevailing party fee vacated and remanded for reconsideration; otherwise affirmed November 13, 2003

Jack L. MANTIA,
*Plaintiff,*

*v.*

Darrel HANSON,
dba Darrel's Economy Mufflers,
*Defendant.*

Darrel HANSON,
dba Darrel's Economy Mufflers,
*Appellant,*

*v.*

BAILEY, PINNEY & ASSOCIATES, LLC,
*Respondent.*

99-12-13064; A112282

79 P3d 404

See also 190 Or App 36, 77 P3d 1143.

Sonia A. Montalbano argued the cause for appellant. With her on the briefs was Cobb, Bosse & Montalbano, LLP.

Jacqueline L. Koch argued the cause for respondent. With her on the brief were Koch & Deering, A. E. Bud Bailey, J. Dana Pinney, and Bailey, Pinney & Associates.

Before Haselton, Presiding Judge, and Deits, Chief Judge, and Linder, Judge.

HASELTON, P. J.

## HASELTON, P. J.

Third-party plaintiff Darrel Hanson (Hanson) appeals from a judgment that (1) dismissed his claim for intentional interference with economic relations against third-party defendant Bailey, Pinney & Associates, LLC (the Bailey firm); (2) awarded the Bailey firm attorney fees under ORS 20.105 "and/or" ORCP 17 C and D; and (3) awarded enhanced prevailing party fees under ORS 20.190(3). Hanson contends, principally, that the court erred in concluding that his tortious interference claim was precluded by a defense of absolute privilege and that, in all events, the court erred in awarding attorney fees and imposing an enhanced prevailing party fee because there was, at least, an objectively reasonable basis in law for the assertion of the tortious interference claim.

We conclude that, as a matter of law, in this procedural posture, the Bailey firm's alleged conduct could not constitute actionable "improper means" for purposes of a tortious interference claim. We thus affirm the dismissal of that claim. Nevertheless, given the evolution of our case law, we cannot say that there was "no objectively reasonable basis" in law for the assertion of the tortious interference claim. Accordingly, we reverse the award of attorney fees and vacate and remand for reconsideration of the imposition of an enhanced prevailing party fee.[1]

For purposes of our review, the material facts are undisputed. In December 1999, plaintiff Mantia, represented by the Bailey firm, brought a number of statutory and common-law claims against his former employer Hanson.[2] Soon thereafter, Hanson's attorney, Montgomery Cobb, sent a letter to the Bailey firm, alleging that Mantia was untruthful

---

[1] As explained below, the trial court's award of attorney fees, under either ORS 20.105 or ORCP 17 C, was based solely on the "no objectively reasonable basis" criterion. However, it is unclear to what extent the imposition of the enhanced prevailing party fee under ORS 20.190 may have been based on other factors described in ORS 20.190(3)(a) through (h). Accordingly, a remand for reconsideration of that matter is required.

[2] The circumstances of that litigation, and the disposition of those "first-party" claims, is described in *Mantia v. Hanson (A115433)*, 190 Or App 36, 77 P3d 1143 (2003).

and that some of the alleged claims were baseless. Cobb demanded that Mantia voluntarily dismiss a number of the claims. Cobb also threatened that Mantia and the Bailey firm would be liable "[i]n the event any further legal action is required to respond to any filings or other actions taken by your firm."

Despite Cobb's letter, in June 2000 the Bailey firm, on behalf of Mantia, filed an amended complaint alleging essentially the same claims. Ten days later, Hanson filed an answer, counterclaims against Mantia, and the third-party claim against the Bailey firm. One of Hanson's counterclaims against Mantia was a claim for tortious interference with an economic relationship. That claim alleged that, after Hanson had demoted Mantia, Mantia, in retaliation, made baseless and defamatory complaints to various agencies with the intent to "interfere with [Hanson's] business by requiring [Hanson] to devote substantial time and money defending against the false claims of [Mantia], by ruining [Hanson's] business, or by putting [Hanson] out of business."

The focus of our review is the related third-party claim by Hanson against the Bailey firm. That claim alleged, in part, that Cobb had sent letters to the Bailey firm "alerting them to the frivolous nature of Mantia's claims," and that,

> "[s]ubsequent to receiving these letters, the Bailey firm continued to pursue the frivolous claims of plaintiff Mantia against defendant Hanson. The Bailey firm has done so in concert with Mantia with the intent to interfere with defendant Hanson's business by requiring Hanson to devote substantial time and money defending against the false claims of the plaintiff, by ruining defendant Hanson's business, or by putting Hanson out of business."

The Bailey firm moved, pursuant to ORCP 21 A(8), to dismiss, alleging, in part, that the tortious interference claim was barred by the defense of absolute privilege because that claim was based on the Bailey firm's conduct undertaken in the representation of its client, Mantia. The Bailey firm concurrently sought attorney fees as a sanction and an enhanced prevailing party fee under ORS 20.190(3). Hanson responded that the absolute privilege was inapplicable in

that it pertains only to statements, and not to conduct, in initiating and prosecuting litigation. Hanson also resisted the motion for sanctions, arguing that the assertion of the tortious interference claim was not objectively unreasonable.

The trial court granted the motion to dismiss, based on the applicability of the absolute privilege:

> "I'm just disturbed by this having been brought in the first place. It didn't have to have been brought. I don't think it's legally appropriate. I don't find any basis for it. It's bad practice. It's disturbing.
>
> "* * * * *
>
> "[The filing of the amended complaint is] absolutely privileged, and I don't see any basis upon which to have brought the third party complaint in the first instance. And I see no way to do anything other than to dismiss the third party complaint."

The trial court further determined that the Bailey firm was entitled to attorney fees under ORS 20.105 and ORCP 17 C(3),[3] awarding fees of $5,388.50, and also imposed an enhanced prevailing party fee of $1,250 pursuant to ORS 20.190(3). Thereafter, the court entered a judgment pursuant to ORCP 67 B embodying that disposition.

On appeal, Hanson and the Bailey firm raise a battery of contentions and countercontentions. Ultimately, however, our analysis and disposition proceed from the resolution of two issues: First, was Hanson's tortious interference claim barred by absolute privilege? Second, even if so, was Hanson's position to the contrary objectively unreasonable,

---

[3] ORCP 17 D authorizes the imposition of sanctions against a person or party found to have made a false certification in violation of ORCP 17 C. While the trial court's order refers generally to "ORCP 17 C and D," a review of the trial court's antecedent ruling makes it clear that the court relied specifically on ORCP 17 C(3), which provides:

> "An attorney certifies that the claims, defenses, and other legal positions taken in the pleading, motion or other paper are *warranted by existing law or by a nonfrivolous argument for the extension, modification or reversal of existing law or the establishment of new law*."

(Emphasis added.)

given the state of the law? Our answers to those two questions obviate the need to address the parties' various alternative, derivative, or subsidiary arguments.

We begin with absolute privilege and, particularly, with the applicability of such a privilege to a tortious interference claim against a lawyer based on the lawyer's conduct undertaken in the course of representing a client. Hanson asserts that absolute privilege should not apply to such a claim—and that, instead, the defendant attorney should be able to raise only a defense of qualified, good-faith privilege.

At its base, this case implicates a fundamental tension between the law of "absolute privilege," as applied to attorneys, and the recognition that there are exceptions—most obviously the availability of "wrongful initiation" actions against attorneys—to the general principle that attorneys cannot be civilly liable for actions undertaken in representing a client. If the protective policies underlying the absolute privilege are, in fact, so "absolute" and compelling, then why permit a "wrongful initiation" action against an attorney? And how does the allowance of such an action, in turn, affect the cognizability of a tortious interference claim against an attorney based on the same operative facts?

■    Oregon courts have long recognized, and enforced, an absolute privilege for statements in the course of or incident to judicial and quasi-judicial proceedings. That privilege applies equally to parties to such proceedings and to their attorneys. *See, e.g., Ramstead v. Morgan*, 219 Or 383, 388-89, 347 P2d 594 (1959) (citing cases); *Chard v. Galton*, 277 Or 109, 559 P2d 1280 (1977); *Troutman v. Erlandson*, 286 Or 3, 593 P2d 793 (1979); *Wallulis v. Dymowski*, 323 Or 337, 918 P2d 755 (1996).

■    Section 586 of the *Restatement (Second) of Torts* (1977) describes the controlling principles:

"An attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding."

*See Lee v. Nash*, 65 Or App 538, 542, 671 P2d 703 (1983), *rev den*, 296 Or 253 (1984) (citing *Restatement* at section 586 with approval). Comment a to section 586 explains the policies underlying the privilege:

> "The privilege stated in this Section is based upon a public policy of securing to attorneys as officers of the court the utmost freedom in their efforts to secure justice for their clients. Therefore the privilege is absolute. It protects the attorney from liability in an action for defamation irrespective of his purpose in publishing the defamatory matter, his belief in its truth, or even his knowledge of its falsity. These matters are of importance only in determining the amenability of the attorney to the disciplinary power of the court of which he is an officer. The publication of defamatory matter by an attorney is protected not only when made in the institution of the proceedings or in the conduct of litigation before a judicial tribunal, but in conferences and other communications preliminary to the proceeding."[4]

*See also Ramstead*, 219 Or at 387 (" 'There are certain relations of life in which it is so important that the persons engaged in them should be able to speak freely that the law takes the risk of their abusing the occasion and speaking maliciously as well as untruly, and in order that their duties may be carried on freely and without fear of any action being brought against them[.]' " (Quoting *Moore v. Weaver*, 2 KB 520, 521 (1928)); *cf. Franson v. Radich*, 84 Or App 715, 719, 735 P2d 632 (1987) (absolute privilege extends to "actions taken and statements made in connection with a judicial proceeding").

■ Given that statement of policy, one might conclude that the privilege should bar any cause of action, against either a party or an attorney, based on the prosecution of judicial or quasi-judicial proceedings. However, there is at least one well-established exception to that principle:

> "One against whom civil or criminal proceedings are initiated may recover in an action for the wrongful initiation of the proceedings * * * if the proceedings have terminated in

---

[4] The *Restatement*'s description of the nature and scope of the privilege afforded litigants under section 587, and the statement of policy in comment a to that section, are virtually identical.

his favor and were initiated without probable cause and for an improper purpose."

*Restatement* at § 587, comment a; *see generally Alvarez v. Retail Credit Ass'n*, 234 Or 255, 259-60, 381 P2d 499 (1963) (describing elements of wrongful initiation cause of action).[5] Consistently with that exception, Oregon courts have confirmed the legal sufficiency of wrongful initiation claims against attorneys. *See, e.g., Vazquez v. Reeves*, 138 Or App 153, 156-59, 907 P2d 254 (1995) (concluding that the plaintiff had adequately pleaded a claim for wrongful initiation against all of the defendants, including the defendant lawyer who had allegedly assisted his clients in improperly obtaining a guardianship order and had shared his clients' purpose of using that order to "coerce [the plaintiff] into consenting to [the defendant clients'] adoption of [the plaintiff's] children"); *Clausen v. Carstens*, 83 Or App 112, 117-18, 117 n 12, 730 P2d 604 (1986) (complaint adequately stated claim for "malicious prosecution" against the defendant lawyer, who had allegedly improperly obtained a receivership order and restraining order *ex parte*; the plaintiff "sufficiently pled that defendants acted maliciously and without probable cause").[6]

■        Significantly, the courts in those cases did not refer to any possible application of absolute privilege as a bar to a "wrongful initiation" or "malicious prosecution" claim. Instead, the courts confined their consideration of the sufficiency of the plaintiffs' pleadings to the elements of that tort, as described in *Alvarez*:

"(1)   The commencement and prosecution by the defendant of a judicial proceeding against the plaintiff;

"(2)   The termination of the proceeding in the plaintiff's favor;

---

[5] *Cf. Checkley v. Boyd*, 170 Or App 721, 734-36, 14 P3d 81 (2000), *rev den*, 332 Or 239 (2001) (extending liability for wrongful initiation of civil proceedings to "active participants").

[6] On occasion, courts have used "malicious prosecution" as shorthand for wrongful initiation of civil process. The two are, of course, distinct terms, with the former pertaining to the initiation or procurement of criminal proceedings. *Restatement* at §§ 653-673. For ease of reference, albeit imprecise, references to "wrongful initiation" in this opinion, where contextually appropriate, also encompass "malicious prosecution."

"(3)  The absence of probable cause to prosecute the action;

"(4)  The existence of malice, or as is sometimes stated, the existence of a primary purpose other than that of securing an adjudication of the claim; and

"(5)  Damages."

234 Or at 259-60. Given the very nature of the "wrongful initiation" cause of action, absolute privilege is inapposite. If a plaintiff can show that, in representing a client in a judicial or quasi-judicial proceeding, an attorney acted "maliciously" and without "probable cause"—virtually the obverse of a qualified, good-faith privilege—the attorney is liable for wrongful initiation of a civil proceeding.

But is wrongful initiation *sui generis* in that respect? Or are there other tort causes of actions that, similarly, are not susceptible to a defense of absolute privilege? Our case law has given varying—and, on occasion, at least implicitly contradictory—answers. *Compare Erlandson v. Pullen*, 45 Or App 467, 608 P2d 1169 (1980), and *Clausen with Franson*, and *Wollam v. Brandt*, 154 Or App 156, 961 P2d 219 (1998), *with Hiber v. Creditors Collection Service*, 154 Or App 408, 961 P2d 898, *rev den*, 327 Or 621 (1998).

In *Erlandson*, the plaintiff brought a number of tort claims, including claims for wrongful initiation of civil proceedings and intentional interference with business relations, against the defendant attorney who had previously represented the plaintiff's former business partner in suing the plaintiff for fraud. 45 Or App at 469. The trial court dismissed those claims. Although we affirmed the dismissal of the wrongful initiation claim because the plaintiff had failed to allege that the prior proceedings had terminated in his favor, we reversed the dismissal of the tortious interference claim against the attorney, concluding that the complaint adequately pleaded that the attorney and his client knew of the plaintiff's relationship with a third party and that "they intentionally interfered with it by instituting the fraud action maliciously and without probable cause." *Id.* at 471. No defense of absolute privilege was raised, or addressed, in *Erlandson*.

*Clausen* was somewhat similar. There, the plaintiff, after a bitter dissolution suit, sued his ex-wife's attorney, alleging a number of tort theories, including wrongful receivership, "malicious prosecution," abuse of process, and intentional interference with business relations. 83 Or App at 114. As in *Erlandson*, we reviewed the allegations of the complaint and found that it sufficiently stated claims for each of those torts. *Clausen*, 83 Or App at 114. In so holding, we made no reference to the issue of privilege—apparently no defense of absolute privilege was raised. However, we did note that, for purposes of a tortious interference claim, "[a]mong the improper means that a defendant may use is unfounded litigation." *Id.* at 119. As support for that proposition, we cited *Top Service Body Shop v. Allstate Ins. Co.*, 283 Or 201, 208-10, 582 P2d 1365 (1978) (*Top Service*); and *Employers' Fire Ins. v. Love It Ice Cream*, 64 Or App 784, 792, 670 P2d 160 (1983).

In *Top Service*, the court addressed the elements of a tortious interference claim and held that a "[d]efendant's liability may arise from improper motives or from the use of improper means." 283 Or at 209. The court further noted that "[c]ommonly included among improper means" was "unfounded litigation." *Id.* at 210 n 11. As support for that observation, the court relied, in part, on comment c to the then-tentative draft of *Restatement (Second) of Torts*, section 767. As ultimately published, that comment states, in part:

> "In a very early instance of liability for intentional interference, the means of inducement employed were threats of 'mayhem and suits,' and both types of threats were deemed tortious. Litigation and the threat of litigation are powerful weapons. When wrongfully instituted, litigation entails harmful consequences to the public interest in judicial administration as well as to the actor's adversaries."

Significantly, for our purposes, the court in *Top Service* made no specific reference to the potential applicability of the absolute privilege pertaining to participation in judicial proceedings. Because the alleged "improper means" in *Top Service* itself did not include the prosecution of "unfounded litigation," there was, presumably, no occasion to address the proper relationship between the tort, as delimited there, and the absolute privilege. The court did, however,

refer generally to notions of "privilege" in the context of its own much broader discussion of the evolution of the tort:

> "No question of privilege arises unless the interference would be wrongful but for the privilege; it becomes an issue only if the acts charged would be tortious on the part of an unprivileged defendant. Even a recognized privilege may be overcome when the means used by defendant are not justified by the reason for recognizing the privilege."

*Top Service*, 283 Or at 210.[7]

Unlike *Top Service*, *Employers' Fire Ins.* did involve an allegation that one party had prosecuted baseless litigation as an improper means to interfere with the other's business. There, by counterclaim, the defendant insured alleged that the plaintiff insurer had filed litigation that it knew to be unfounded for the purpose of delaying payment under a fire loss policy, so that the defendant would be unable to resume its ice cream distribution business and the insurer would be relieved of the obligation to pay expenses associated with any continuation of the business. 64 Or App at 792. We noted that, under *Top Service*, " '[i]mproper means' includes unfounded litigation" and reversed the trial court's order striking the tortious interference claim. *Id.* at 791. In doing so, we again made no reference to the possible applicability of the absolute privilege.

In sum, *Erlandson*, *Employers' Fire Ins.*, and *Clausen* all confirmed the availability of tortious interference claims based on the prosecutions of allegedly unfounded litigation. But none of those decisions referred to, much less explored, the possible application of the absolute privilege.

---

[7] The court's reference to "privilege" in that context appears to correspond to the generic meaning of that term:

> " 'Privilege' is the modern term applied to those considerations which avoid liability where it might otherwise follow. * * * [I]t appl[ies] to any circumstance justifying or excusing a *prima facie* tort, such as a battery, assault, or trespass; it signifies that the defendant has acted to further an interest of such social importance that it is entitled to protection, even at the expense of damage to the plaintiff. The defendant is allowed freedom of action because his own interests, or those of the public, require it, and because social policy will best be served by permitting it. The privilege is bounded by current ideas of what will most effectively promote the general welfare."

W. Page Keeton, *Prosser and Keeton on Torts* § 16, 108-09 (5th ed 1984).

Meanwhile, however, immediately after *Employers' Fire Ins.*, and before *Clausen*, we began extending the privilege to preclude claims for torts other than defamation. *See Lee*, 65 Or App at 542.

In *Lee*, the plaintiff filed a "false light" claim against the defendant attorney, based on the attorney's filing of a motion in bankruptcy court that sought to change a wage earner plan to a liquidation plan, which, the plaintiff alleged, placed her in a "false light" with her creditors. *Id.* at 540. We held that the absolute privilege barred that claim. Invoking *Restatement (Second) of Torts*, section 652F, we concluded:

> "Although no Oregon case has yet considered the issue, the rules on absolute privilege to publish defamatory matter apply to the publication of any matter that is an invasion of privacy, including material that raises a 'false light' claim."

65 Or App at 542.[8]

In *Franson*, we further, and dramatically, extended the application of the absolute privilege in two respects. First, we held that the principle applied not merely to defamatory statements, but also to conduct undertaken in connection with litigation. Second, we applied the privilege to preclude a tort claim beyond the defamation/false light realm— *viz.*, intentional infliction of emotional distress (IIED).

In *Franson*, the plaintiffs, after consulting with physicians and clergy, decided not to undertake extraordinary measures to prolong the life of their terminally ill newborn child. The defendants, Right To Life Oregon and that organization's attorney, Radich, notified the Children's Services Division (CSD) that the child was in the hospital and suffering neglect and initiated an action in circuit court, seeking a mandatory injunction to require the hospital to provide life support for the child. 84 Or App at 717. The court issued a temporary injunction, and CSD, "prompted by defendants' actions," filed a petition in juvenile court charging the plaintiffs with neglect. Consequently, the infant was removed

---

[8] *Restatement (Second) of Torts*, section 652F provides:

"The rules on absolute privileges to publish defamatory matter * * * apply to the publication of any matter that is an invasion of privacy."

from the plaintiffs' physical custody against their wishes. At the ensuing hearing on the issuance of permanent injunctive relief, the defendant attorney accused the plaintiffs in defamatory language of starving their child to death, "with less than human treatment than is normally rendered dogs and cats." *Id.* at 717-18. The court ultimately dissolved the temporary injunction, and the child died while an appeal was pending. Shortly thereafter, the plaintiffs brought an action that alleged claims for, *inter alia*, IIED, based both on the defendants' actions in notifying CSD and filing the injunction action, and on the statements made in connection with the injunction proceedings. The trial court dismissed that claim.

On appeal, we affirmed the dismissal of the IIED claim against the defendant lawyer on the ground that her actions were shielded by the absolute privilege:

> "In *Troutman v. Erlandson*, 286 Or 3, 6, 593 P2d 793 (1979), the Supreme Court stated that it had 'recognized the absolute privilege accorded communications made by attorneys in judicial proceedings.' * * * Although the absolute attorney privilege question most frequently arises in defamation actions, this court has held that it applies to the 'publication of any matter that is an invasion of privacy.' *Lee*[ ], 65 Or App at 542. Because the privilege 'is based upon a public policy of securing to attorneys as officers of the court the utmost freedom in their efforts to secure justice for their clients,' we see no reason why it should not also apply in claims for intentional infliction of emotional distress *based on actions taken and statements made* in connection with a judicial proceeding."

*Franson*, 84 Or App at 719 (internal citations omitted; emphasis added).[9] Thus, for the first time, we extended the privilege's protections beyond its defamation-related premises, as described both in the *Restatement* and in Oregon common law.

Chief Judge Joseph, concurring, commented that in certain situations, epitomized by *Franson*, the absolute

---

[9] We similarly affirmed the dismissal of the IIED claim against the organizational defendant as precluded by the absolute privilege accorded a party for communications made in connection with a judicial proceeding. *Franson*, 84 Or App at 719.

privilege would unduly protect the "utterly unconscionable course of officious intermeddling on the part of [attorneys], for which they ought to be held to account." *Franson*, 84 Or App at 722 (Joseph, C. J., concurring). He then suggested that a "good faith and fair dealing" qualification be "engraft[ed]" onto the privilege to prevent such abuses. *Id.*

Presiding Judge Buttler, specially concurring, disagreed with that suggestion:

> "I would approach with great care and hesitation the suggestion that there be a good faith and fair dealing limitation engrafted on the privilege. * * * There is no doubt that an absolute privilege can be abused. *However, if a lawsuit is commenced and maintained for a purpose other than that for which it is intended, the tort remedy for abuse of process is available.*"

*Id.* at 723-24 (Buttler, P. J., specially concurring) (emphasis added).

In *Wollam*, we applied the absolute privilege to bar a claim against an attorney for intentional interference with contract—and did so without reference to the substantive holdings in *Erlandson* and *Clausen*.[10] There, the defendant was an attorney who, in the course of representing the plaintiff's former supervisor, had sent a letter to the plaintiff's employer, asserting that the plaintiff had falsified his employment application. The plaintiff brought an action against the defendant attorney, asserting claims for invasion of privacy, defamation, and interference with contract, based on that communication. *Wollam*, 154 Or App at 158. The trial court granted the defendant attorney's motion for summary judgment as to all claims.

We affirmed, concluding that the absolute privilege precluded all of the plaintiff's claims, including the claim for interference with contract. In so holding, we reiterated the fundamental policy of the privilege as securing "to attorneys

---

[10] Our opinion in *Wollam* did refer to an earlier opinion in the epic *Troutman v. Erlandson* saga—*Troutman*, 286 Or at 7—*see Wollam*, 154 Or App at 162. However, that case pertained to the actionability of statements by an attorney to a party "who had no direct connection with the judicial proceeding." *Troutman*, 286 Or at 6.

the utmost freedom in their efforts to secure justice for their clients." *Id.* at 164. We emphasized:

> "The absolute privilege applies not only to defamation actions, but to any tort action based on statements made in connection with a judicial proceeding. *See, e.g., Franson*[, 84 Or App at 719] (privilege extends to claims for intentional infliction of emotional distress and invasion of privacy); *Lee*[, 65 Or App at 542] (privilege extends to 'false light' claims for invasion of privacy)."

*Id.* at 162 n 5. We did not, however, address the relationship of the privilege to the elements of tortious interference. *See, e.g., Top Service*, 283 Or at 210, 210 n 11 (listing "defamation" as one of several commonly employed "wrongful means" and noting the possibility that, for purposes of tortious inference, "[e]ven a recognized privilege may be overcome").

Finally, in *Hiber*, we addressed the sufficiency of a "false imprisonment" claim against an attorney predicated on the attorney's filing of pleadings and affidavits. There, the defendant attorney represented the codefendant credit agency in a debt dispute with the plaintiff. After the plaintiff failed to produce certain records in a debtor's examination, the defendant attorney filed *ex parte* motions and affidavits with the court that resulted in the issuance of an arrest warrant and, ultimately, the plaintiff's arrest. 154 Or App at 410-12. The plaintiff sued the attorney for false imprisonment, and the trial court granted the attorney's motion for summary judgment. Because the warrant was, in fact, procedurally defective (and thus "void"), the question before us on appeal was "whether some form of privilege * * * should attach when an attorney, in pursuit of a client's interests, in good faith successfully procures issuance of an arrest warrant that is procedurally defective." *Id.* at 412, 415.

We held that a qualified privilege protected the attorney's actions. That privilege "is not absolute, but rather is limited to actions taken in good faith and that otherwise do not involve maliciousness or deliberate misadministration of justice." *Id.* at 415 (citations omitted). Like the absolute privilege "in the area of defamation," the qualified privilege "serves to protect the attorney-client relationship," because "as long as the attorney acted in good faith, the essential

rationales for the privilege (*e.g.*, promoting resort to judicial process, meeting ethical responsibilities to client, acknowledging quasi-judicial role of attorney in court proceedings) retain full force." *Id.* at 416-18. Given those concerns, we determined that, because the motions and affidavits had been filed in good faith and without malice, the privilege protected the attorney. We then concluded that "the proper action in a case of this kind is a claim for malicious prosecution or wrongful initiation of civil proceedings, both of which require a showing of malice or bad faith." *Id.* at 419. Thus, in *Hiber*, we ultimately characterized a false imprisonment claim predicated on an attorney's filing of pleadings as being, in effect, a wrongful initiation claim, subject to all of the requirements of such a claim. *See id.* at 419-20.[11]

*Hiber* was our latest—but clearly not our last—word on the cognizability of tort claims against lawyers and litigants based on their statements or conduct in prosecuting legal proceedings. Our case law is hardly a seamless web. Most obviously, while *Erlandson, Employers' Fire Ins.*, and *Clausen* endorsed the legal sufficiency of tortious interference claims based on prosecution of baseless litigation, without reference to privilege, *Wollam* precluded a tortious interference claim on the basis of privilege, without reference to those cases—or, even more significantly, to *Top Service*. With only one exception (*Hiber*), none of our opinions has addressed the relationship between the elements of a particular cause of action and the nature of potentially available privileges. And with only two exceptions (*Hiber* and Presiding Judge Buttler's concurrence in *Franson*), none of our opinions has touched on the availability of a claim for wrongful initiation of civil proceedings in these circumstances.

It is, frankly, tempting to attempt to bring order out of (seeming) chaos by imposing a single, omnibus solution:

---

[11] In so holding, we quoted with approval the following observation:

" 'Where a citizen procures the issuance of a warrant by a magistrate by making a formal charge of crime, he is not liable in an action for false imprisonment for the resulting arrest when the warrant is served. * * * The only protection available to the accused is the action for malicious prosecution[.]' "

*Hiber*, 154 Or App at 419 (quoting Fowler V. Harper and Fleming James, Jr., *The Law of Torts* § 4.11, 341-42 (1956)).

The absolute privilege would bar all tort claims against attorneys and litigants based on their statements and conduct in prosecuting legal proceedings, *except for wrongful initiation claims*. That is, wrongful initiation would be the exclusive vehicle for recovering damages resulting from such behavior. That, of course, was the result that Judge Buttler espoused in *Franson* and that we, at least implicitly, adhered to in *Hiber*.

Such an approach would be clean and straightforward: To prevail, a plaintiff would be required to demonstrate both that the defendant acted in bad faith and without probable cause. *See Alvarez*, 234 Or at 259-60. Those rigorous requirements would ensure that, while truly egregious statements and conduct would not be shielded by absolute privilege, attorneys and their clients would not be routinely exposed to retaliatory actions. Another advantage of that "exclusive tort" approach concerns timing: If wrongful initiation were the exclusive "litigation-based" tort, no such actions could be filed until after the predicate proceeding had "terminat[ed] * * * in the plaintiff's favor." *Id.* That would eliminate the potential—which was realized in the present case—of the original, allegedly "unfounded" claim and the "tortious interference" counterclaim proceeding concurrently in the same action. Moreover, the requirement of prior successful termination would act as yet another "baffle" on retaliatory claims against lawyers or their clients.

That "exclusive tort" approach is appealing. But *Top Service*, and our derivative case law, do not permit quite so simple a solution. As noted, based on our understanding of *Top Service*, we have consistently endorsed intentional interference claims in which the alleged "improper means" has been the prosecution of baseless litigation, including the conduct of attorneys in assisting their clients in pursuing such litigation. Thus, wrongful initiation cannot be the *exclusive* litigation-based tort. And yet, *Top Service*, when properly understood, imposed limitations on "unfounded litigation"-based tortious interference claims—limitations that are fully consonant with the balance of our case law.

The key lies in *Top Service*'s concluding discussion of the role of "privilege" with respect to tortious interference claims:

"No question of privilege arises unless the interference would be wrongful but for the privilege; it becomes an issue only if the acts charged would be tortious on the part of an unprivileged defendant. *Even a recognized privilege may be overcome when the means used by defendant are not justified by the reason for recognizing the privilege.*"

*Top Service*, 283 Or at 210 (emphasis added). As we understand that language, even a defense of absolute privilege cannot defeat a claim for tortious interference where the nature of the defendant's conduct was such that the underlying purposes of the privilege would not be served by immunizing that conduct.

■■     At first blush, that formulation may seem inscrutable: When is an absolute privilege not absolute? But at least with respect to the absolute privilege pertaining to participation in judicial and quasi-judicial proceedings, there is a ready answer: An actor's conduct is so egregious as to be deprived of the protections of the absolute privilege when that conduct satisfies the elements of wrongful initiation. *See Restatement* at § 587, comment a (absolute privilege does not apply to claim for wrongful initiation of civil proceedings/malicious prosecution). Thus, the prosecution of unfounded litigation constitutes actionable "improper means" for purposes of tortious interference where (1) the plaintiff in the antecedent proceedings lacked probable cause to prosecute those proceedings; (2) the primary purpose of those proceedings was something other than to secure an adjudication of the claims asserted there; and (3) the antecedent proceedings were terminated in favor of the party now asserting the tortious interference claim. *See Alvarez*, 234 Or at 259-60; *Restatement* at §§ 653, 674.

■     Here, read broadly, Hanson's third-party claim against the Bailey firm arguably pleaded that (1) the Bailey firm knew that some of the claims it was bringing on behalf of Mantia were unfounded; and (2) the Bailey firm proceeded nevertheless for the purpose of destroying Hanson's business. But the third-party claim did not—and, indeed, could not—plead facts sufficient to establish the final requisite element to "overcome" the privilege, *viz.*, that the antecedent proceedings had been "terminated in favor of the person against whom they [were] brought." *Restatement* at § 674.

That is so because Hanson filed his third-party tortious interference claim *before* the predicate first-party claims were adjudicated.

Given that timing, because of the application of the absolute privilege, the Bailey firm's actions in prosecuting Mantia's claims against Hanson could not constitute actionable "improper means" for purposes of tortious interference unless and until the "first-party" proceedings were "terminated" in Hanson's favor. In sum, in this posture, the legal sufficiency of Hanson's third-party tortious interference claim depended on a condition that had not yet occurred— and might never occur.[12] Consequently, the trial court did not err in dismissing the third-party complaint.

■■ Hanson's remaining assignments of error challenge the trial court's award of attorney fees as sanctions under ORS 20.105(1)[13] and ORCP 17 C(3),[14] as well as the enhanced prevailing party fee pursuant to ORS 20.190.[15] An award of fees under ORS 20.105 "ultimately depends on the determination of whether plaintiff's claims were not 'objectively reasonable.' That determination is a matter of law." *Secor Investments, LLC v. Anderegg*, 188 Or App 154, 175, 71 P3d 538 (2003). Consequently, we must reverse the award if there was an "objectively reasonable basis" for Hanson's third-party claim. *Id.*

Although the trial court was ultimately correct in dismissing Hanson's third-party claim, this court's decisions had not conclusively determined the proper application of the absolute privilege to tortious interference claims based on the

---

[12] *See Mantia*, 190 Or App at 39 (describing the trial court's disposition of the first-party claims, which occurred *after* the dismissal of the third-party tortious interference claim).

[13] ORS 20.105 requires an award of "reasonable attorney fees" to "a prevailing party in the proceeding" if the court finds that the opposing party lacked an "objectively reasonable basis" for bringing the suit.

[14] *See* 190 Or App at 416 n 3.

[15] ORS 20.190(2) allows for recovery of a "prevailing party fee" by "a prevailing party" in "any civil action or proceeding in which recovery of money or damages is sought[.]" The fee is not an award of attorney fees. ORS 20.190(3) allows an award of an enhanced fee "up to an additional $5,000" in certain circumstances. In order to award the enhanced fee, the court must consider certain factors enumerated in ORS 20.190(3)(a) to (h).

initiation and prosecution of allegedly unfounded litigation. Indeed, as this opinion recounts, that question was unsettled and manifestly subject to reasonable dispute. Consequently, and after having grappled with that question ourselves, we cannot say that it was objectively unreasonable for Hanson to assert the third-party tortious interference claim. *See Mattiza v. Foster*, 311 Or 1, 8, 803 P2d 723 (1990) (an objectively unreasonable or "meritless position is one that the court determines is entirely devoid of factual or legal support").

■ For the same reasons, we reverse the alternative award of attorney fees under ORCP 17 C. Because of the unsettled state of the law, we cannot say that Hanson's position was not "warranted by existing law" or, at least, by a "nonfrivolous argument for the extension [or] modification" of existing law. ORCP 17 C(3).

■ Finally, and in contrast to our reversal of the trial court's attorney fee award, we vacate and remand for reconsideration of the court's imposition of an enhanced prevailing party fee under ORS 20.190. That is so because, in imposing that fee, the court considered each of the factors prescribed in ORS 20.190(3)(a) to (h), including, but not limited to, the objective reasonableness of Hanson's position. *See* ORS 20.190(3)(b). Because the trial court exercised its discretion under ORS 20.190(3) based, in part, on a criterion that we have now determined was inapposite, we remand for the trial court to again exercise its discretion in light of our determination that Hanson's assertion of the third-party claim was not objectively unreasonable.

Award of attorney fees pursuant to ORS 20.105 and ORCP 17 reversed; award of enhanced prevailing party fee pursuant to ORS 20.190(3) vacated and remanded for reconsideration; otherwise affirmed.