PAIGE CAPITAL MANAGEMENT, LLC, Paige Opportunity Partners, L.P., Paige Opportunity Master Fund, LTD, Paige GP, LLC, Michele Paige and Christopher Paige, Plaintiffs,

v.

LERNER MASTER FUND, LLC, and Brooklyn N.Y. Holdings LLC, Defendants.

Lerner Master Fund, LLC, Counterclaim/Third– Party Plaintiff,

v.

Paige Capital Management, LLC, Paige Opportunity Partners, L.P., Paige Opportunity Master Fund, LTD, Paige GP, LLC, Michele Paige and Christopher Paige, Counterclaim/Third–Party Defendants.

Civil Action No. 5502–VCS.

Court of Chancery of Delaware.

Submitted: March 11, 2011.

Decided: May 5, 2011.

Steven K. Kortanek, Esquire, Michael G. Busenkell, Esquire, Womble Carlyle Sandridge & Rice, PLLC, Wilmington, Delaware; William M. Dolan III, Esquire, Katherine S. Bromberg, Esquire, Jessica Calagione, Esquire, Brown Rudnick LLP, New York, New York, Attorneys for Plaintiffs, Counterclaim Defendants and Third Party Defendants.

Joel Friedlander, Esquire, Jeffrey M. Gorris, Esquire, Bouchard Margules & Friedlander, P.A., Wilmington, Delaware; David Boies, Esquire, Boies, Schiller & Flexner LLP, Armonk, New York; Steven I. Froot, Esquire, Christopher E. Duffy, Esquire, Boies, Schiller & Flexner LLP, New York, New York, Attorneys for Defendant, Counterclaim/Third–Party Plaintiff.

STRINE, Vice Chancellor.

## I. *Introduction*

A traditional privilege has attached to testimony in judicial proceedings that immunizes a lawyer or witness from a collateral claim alleging that the testimony amounted to defamation or a related tort based on the alleged reputational harm suffered by a third party because of what the lawyer or witness said. That privilege has been deemed absolute and is thought

to serve several important purposes, including encouraging the peaceable resolution of disputes in the courts, fostering the willingness of witnesses to testify freely and counsel to argue zealously, and limiting the proliferation of follow-on lawsuits.[1] The presence of safeguards and sanctions against offering knowingly false testimony in the litigation setting has also been thought to diminish the costs of this privilege.[2]

Here, in the months that preceded the filing of this lawsuit, a manager of a hedge fund sent a heated letter to its sole outside investor in which the manager made statements about what the manager would do if the investor did not surrender to the manager's settlement demands. Those statements can fairly be read as threats by the manager to breach its fiduciary duties owed to the investor. The hedge fund manager now seeks to bar the letter's admission into evidence on the grounds that the letter is subject to an absolute privilege and otherwise barred from admission by Delaware Rule of Evidence 408.

I reject that argument and admit the letter into evidence. The public interest served by shielding participants in judicial proceedings from being collaterally sued for defamation or related torts based on the adverse reputational or emotional effect of their testimony on others does not extend to allowing a party to use the privilege to block the introduction of a litigation-related communication in which that party threatens to engage in potentially tortious behavior if the recipient does not surrender to its demands. Facing responsibility for wrongful threats they make in

settlement letters does not chill the ability of participants in the litigation process to tell their full story in support of their claims. Instead, another venerable testimonial rule applies to address situations like this. Delaware Rule of Evidence 408, which has a similar counterpart in the Federal Rules of Evidence, addresses the extent to which settlement communications are admissible into evidence. When, as is the case here, evidence that a party made a settlement offer is not being used to prove liability, or the amount of that liability, for a pre-existing claim of wrongdoing, that evidence may be admitted if it is otherwise relevant.

Here, the investor seeks to introduce the threats made in the settlement letter not to prove claims pre-existing the letter, but as evidence of new wrongdoing and of a wrongful state of mind. The evidence may or may not turn out to be useful for that purpose, but that is a proper purpose for its use, and I therefore admit it.

## II. *Factual Background*

The hedge fund manager is an entity, Paige Capital Management, LLC, that is in turn managed by Michele and Christopher Paige, who are husband and wife. Paige Capital Management was founded by Michele Paige along with three other entities that would serve as vehicles for her hedge fund, Paige Opportunity Partners, L.P., Paige Opportunity Master Fund, LTD, and Paige GP, LLC. Together, those four entities, all controlled by the Paiges, operated as a hedge fund (the "Hedge Fund") managed by Michele Paige with the help of her husband, Christopher.

---

1. *See, e.g.,* 86 C.J.S. *Torts* § 36 ("The principal public policies furthered by [the absolute litigation privilege] are ensuring free access to the courts by prohibiting derivative tort actions; promoting complete and truthful testimony; encouraging zealous advocacy; giving

finality to judgments; and preventing unending litigation.").

2. *See, e.g.,* Paul T. Hayden, *Reconsidering the Litigator's Absolute Privilege to Defame,* 54 OHIO ST. L.J. 985, 1003 (1993).

Although Michele Paige has experience making investments working for other hedge fund managers, Paige Capital Management was her first endeavor in running her own fund, and her husband Christopher Paige has been deeply involved in its operation from nearly its inception. The Paiges thought themselves fortunate to land as a seed investor, Lerner Master Fund (the "Lerner Fund"), a fund controlled by Randy Lerner and the Lerner family. As a seed investor, the Lerner Fund sought to make money not simply from its own invested capital, but also to share in some of the management fees as the Hedge Fund found other investors.

The Lerner Fund's investment in the Hedge Fund is subject to written agreements, the meaning of which is at issue in this litigation. It suffices to say for present purposes that the Paiges envisioned that the Lerner Fund would be a very long-term investor in their Hedge Fund and that they could depend on the Lerner Fund being stuck in. By contrast, the Lerner Fund viewed itself as being required to remain in the Hedge Fund without paying a high exit cost for only a three year period.

In January 2009, a little over one year after the Lerner Fund first invested, it informed the Paiges that it wished to withdraw its investment from the Hedge Fund at the end of its third year as an investor, or even earlier if mutually acceptable terms could be agreed upon. As of then and to the present, the Paiges have never been able to procure other investors in the Hedge Fund and thus the Lerner Fund's money still constitutes over 99% of the

Hedge Fund's invested capital, with Michele Paige having the only other investment of around $40,000, a sum that is in stark contrast to the Lerner Fund's $40 million.

After a long period of haggling, Christopher Paige, who during the events giving rise to this dispute was an attorney [3] serving as the Paiges' counsel, wrote an emotional letter to the Lerner Fund in March 2010 (the "March 2010 Letter"). In that letter, he indicated that the Paiges believed that even if the Lerner Fund could withdraw after three years, the Paiges could impose the so-called "gates" referenced in the limited partnership agreement of Paige Opportunity Partners, L.P.[4] Those gates, if applicable to the Lerner Fund, allow the Paiges to limit total withdrawals from the Hedge Fund to 20% of the total value of the Hedge Fund's net assets in any six month period.[5] Because the Paiges had raised no outside capital other than that from the Lerner Fund, the Lerner Fund's capital constituted essentially all of the Hedge Fund's assets. This meant that it would take many years before the Lerner Fund could get all its capital out.

In the March 2010 Letter, Christopher Paige made vivid his view of how things would go if the Lerner Fund did not settle and instead attempted to get relief in the courts against the Paiges to leave earlier. For instance, in the March 2010 Letter, Christopher Paige stated:

> "[The Lerner Fund] should remember that our right to raise the gates ensures that we will continue to manage your

3. Christopher Paige is a former member of the New York Bar. He retired from the Bar after the proceedings in this lawsuit had begun. Tr. at 635 (Christopher Paige).

4. One of the most important issues in this case is whether the gates referenced in the

limited partnership agreement may be wielded against the Lerner Fund, which negotiated a specific Revenue Sharing Agreement governing its investment in the Hedge Fund.

5. JX–1 (Limited Partnership Agreement (October 31, 2007)) § 8.2(a)-(b).

money throughout the litigation. Similarly, you should remember that you will be responsible for your pro rata share of the [Hedge Fund's] legal expenses, so— in a very real sense—you will be paying our attorneys' fees as well as your own.

. . . .

. . . [W]e are fully prepared to litigate this matter to the bitter end because we will continue to manage your money, and collect management and incentive fees, until this matter is resolved many years hence. The economic reality, therefore, is that you cannot win because you will spend more litigating than we're fighting over.

If this matter is not resolved quickly, we will mitigate our damages by investing the portfolio in the high risk, long-term, illiquid, activist securities in which we specialize, and we will turn the matter over to the [Hedge Fund's] attorneys with instructions to spend whatever it takes to defend the [Hedge Fund]. (*Please remember that you are responsible for your pro rata share of the [Hedge Fund's] expenses.*)." [6]

One colorable reading of the March 2010 Letter is that the Paiges would engage in improper litigation tactics designed not to litigate any case in an aggressive but fair way, but would instead purposely engage in improper, frivolous and delaying litigation tactics effectively using the Lerner Fund's own money, thus thwarting the ability of the Lerner Fund to get justice.

Another plausible reading of the March 2010 Letter is that the Paiges were set upon investing the Lerner Fund's money, not to advance the best interests of the Hedge Fund or its investors, but solely to aid the self-interest of the Paiges in tying up the Lerner Fund's investment and ensuring that the Paiges could draw their management fees for the longest time possible, regardless of whether that was best for the Hedge Fund's investors, especially the Lerner Fund, whose investment comprised over 99% of the capital in the Hedge Fund. Put simply, it is plausible to read the March 2010 Letter as one in which the Paiges threatened to breach their fiduciary duties owed to the Lerner Fund if the Lerner Fund did not accede to their terms.

On May 18, 2010, the Paiges filed their complaint in this action.[7] In that complaint, the Paiges seek a declaration that they were permitted, under their agreements with the Lerner Fund, to impose the gates on the Lerner Fund and to prevent it from withdrawing more than 20% of the total assets in the Hedge Fund in any six month period after the initial three-year lockup and that the Hedge Fund is required to indemnify the Paiges for their costs of prosecuting this litigation.

On July 30, 2010, the Lerner Fund answered the Paiges' complaint and asserted four counterclaims: i) breach of contract against the Paiges for failing to honor

---

**6.** Friedlander Aff. Ex. 39 (Letter from Christopher Paige to the Lerner Fund (March 14, 2010)) ("March 2010 Letter") (emphasis added).

**7.** On November 24, 2010, the Paiges amended their complaint and added seven additional counts. Count II seeks a declaratory judgment that the Paiges are entitled to indemnification and advancement of their expenses of the litigation. Count III seeks a declaratory judgment that the Paiges are entitled to in-

demnification for any losses suffered. Count IV is a claim for breach of the fund agreements. Count V is a claim for breach of the Lerner Fund's alleged agreement to help find a replacement seed investor for the Paiges. Count VI is for breach of the implied covenant of good faith and fair dealing. Count VII is for breach of fiduciary duty against the Lerner Fund. And Count VIII is for defamation.

their obligations under their agreements with the Lerner Fund by refusing to allow the Lerner Fund to withdraw all of its investment, violating their fiduciary duties, and not honoring the Lerner Fund's information rights; ii) a declaratory judgment enforcing the Lerner Fund's right to withdraw all of its money without application of the gates; iii) breach of fiduciary duty against the Paiges; and iv) a claim for judicial dissolution under 6 *Del. C.* § 17–802 on the ground that it is no longer reasonably practicable to carry on the business of the Hedge Fund. Importantly, the Lerner Fund argues that the contractual agreements governing the Lerner Fund's investment provide that one of the ways in which the Lerner Fund could exit the Hedge Fund immediately and uninhibited by any withdrawal restrictions is if the Paiges violate their fiduciary duties.[8]

In March and April 2011, a four-day trial was conducted to resolve the parties' disputes. At that trial, the Lerner Fund attempted to introduce the March 2010 Letter as evidence of the Paiges' breach of their fiduciary duties and their wrongful state of mind. The Paiges objected on the grounds that the March 2010 Letter was inadmissible under Delaware Rule of Evidence 408 and the absolute litigation privilege, a privilege that the Paiges believe absolutely bars from admissibility to prove

any tort claim, any communication related to a pending or contemplated litigation. I denied that motion at trial for reasons I gave briefly with the promise that I would set forth those reasons more fully in writing.[9] This decision explains why I reject the Paiges' motion to exclude the March 2010 Letter from evidence. As a predicate to grappling directly with their argument, it is necessary to describe the so-called absolute litigation privilege and the public policy reasons for its continued existence.

### III. *The Absolute Litigation Privilege And Its Policy Rationale*

■ The absolute litigation privilege, "long recognized in Delaware ... protects from actions for defamation statements of judges, parties, witnesses and attorneys offered in the course of judicial proceedings so long as the party claiming the privilege shows that the statements issued as part of a judicial proceeding and were relevant to a matter at issue in the case."[10] The privilege has been described as resting "upon the public policy which deems it desirable that all suitors, whether malicious and bold, or conscientious and timid, should have free access to the conscience of the State with whatever complaint they choose to make ... [and that] [t]his is necessary to a thorough and searching investigation of the truth."[11]

---

8. JX–2 (Revenue Sharing Agreement (October 31, 2007)) § 6.4(c) ("If [the Hedge Fund] or any of its affiliates engages in any activity in the course of [the Hedge Fund's] business or investment management which constitutes gross negligence, willful misconduct, a material breach of fiduciary duty or a knowing violation of any applicable material law, regulation or order, then [the Lerner Fund] may immediately exercise its Right of Withdrawal. . . .").

9. Tr. at 329–30 (The Court).

10. *Barker v. Huang,* 610 A.2d 1341, 1345 (Del. 1992).

11. Van Vechten Veeder, *Absolute Immunity in Defamation: Judicial Proceedings,* 9 Colum. L.Rev. 463, 477 (1909); *see also* 50 Am.Jur. 2d *Libel and Slander* § 279 ("The purpose of granting absolute immunity from liability for a privileged publication or communication made in a judicial proceeding is to keep the paths leading to the ascertainment of truth as free and unobstructed as possible. The underlying rationale of the absolute immunity is that the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements.").

This absolute privilege to speak freely in relation to litigation without fear of being sued for defamation is a long-standing common law rule.[12] In fact, some courts have relied on the privilege's long history itself as a justification for continuing to apply the privilege.[13] Putting aside the debatable goal of continuing any common law rule for continuity's sake alone,[14] there are at least two related policy justifications advanced for the continuing vitality of the absolute litigation privilege: first, that the protection afforded by it is necessary to encourage citizens to peaceably resolve their differences in court through litigation (or the threat of litigation) by allowing them to speak to their adversaries freely without fear of facing liability for what they say, and without the prospect of having their good faith legal claims prompt the initiation of more claims;[15] and second, that there are already alternative enforcement mechanisms in place in the litigation context that render defamation actions against lawyers and other litigating parties less necessary.[16]

The Delaware Supreme Court has explained that the "well-recognized policy supporting the absolute privilege" is "to facilitate the flow of communication between persons involved in judicial proceedings and, thus, to aid in the complete and full disclosure of facts necessary to a fair adjudication."[17]

Both of those policy reasons for maintaining the absolute litigation privilege, however, must be balanced against another important policy interest, namely, a person's right to be free from defamatory statements. As one commentator put it, the absolute litigation privilege "presents a conflict ... between two principles equally regarded by the law—the right of the individual, on the one hand, to enjoy his reputation unimpaired by defamatory acts, and, on the other hand, the necessity, in the public interest, of a free and full disclosure of facts in the conduct of the ... judicial department[ ] of the government."[18]

Traditionally, the absolute litigation privilege was only applicable to statements made during the course of judicial proceedings, but there are a substantial number of jurisdictions that have recognized the utility in extending the privilege

---

12. The privilege has been applied as early as 1497 in England. *See* Hayden, *supra* note 2, at 985 (citing *Beauchamps v. Croft*, 73 Eng. Rep. 639 (Q.B.1497)).

13. *See, e.g., Torrey v. Field*, 10 Vt. 353, 415 (1838) ("If the matter were *res integra,* we might be inclined to qualify this rule. But such is now the settled law. And it is a principle of long standing, and has not, in practice, been found the occasion of any great injury or wrong. It being our duty to declare the law, as it existed in England at the time of our statute adopting it, we do not consider this portion of it as so far inconsistent with our circumstances or condition, as to warrant us in disregarding it.").

14. *See, e.g.,* Oliver Wendell Holmes, *The Path of the Law*, 10 HARV. L.REV. 457, 469 (1897) ("It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.").

15. Hayden, *supra note 2,* at 1003.

16. *Id.*

17. *Barker,* 610 A.2d at 1345 (quoting *Hoover v. Van Stone,* 540 F.Supp. 1118, 1122 (D.Del. 1982)). *See also* RESTATEMENT (SECOND) OF TORTS § 586 cmt. a (1977) (noting that the absolute litigation privilege is "based upon a public policy of securing to attorneys as officers of the court the utmost freedom in their efforts to secure justice for their clients.").

18. Van Vechten Veeder, *Absolute Immunity in Defamation: Judicial Proceedings,* 9 COLUM. L.REV. 463, 463 (1909).

to cover communications made in advance of anticipated litigation.[19] In those jurisdictions, the litigation privilege has been thought to allow a party to contemplated litigation to "preview" its claims to the other side in order to initiate frank settlement talks without having to temper the boldness of its assertions for fear of a defamation or other related tort suit.[20] That said, for reasons the reader can discern from this decision, there is also a sound argument for confining the absolute litigation privilege to statements made in the formal judicial setting, which

has truth-promoting safeguards that make the cost-benefit argument for the privilege an easier one to justify. Although in dictum, our Superior Court appears to have accepted as given the notion that the privilege applies to pre-litigation communications, that question has not been addressed by our courts in a contested setting where the answer was relevant to the outcome.[21] Here, the Lerner Fund does not contest this temporal aspect of the privilege's scope.[22] Because it has taken that position, I accept solely for the sake of analysis that the absolute litiga-

19. E.g., Vitauts M. Gulbis, *Libel and slander: attorneys' statements, to parties other than alleged defamed party or its agents, in course of extrajudicial investigation or preparation relating to pending or anticipated civil litigation as privileged*, 23 A.L.R.4th 932 (1983) (noting the divergence among courts regarding whether communications made before the formal commencement of judicial proceedings are privileged and cataloging instances of jurisdictions following each view); RESTATEMENT (SECOND) OF TORTS § 586 (1977) (embracing the position that "[a]n attorney at law is absolutely privileged to publish defamatory matter concerning another in communications *preliminary to a proposed judicial proceeding*, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding" and cataloging instances of jurisdictions that have adopted that view) (emphasis added).

20. E.g., *Krouse v. Bower*, 20 P.3d 895, 899 (Utah 2001) ("The judicial proceeding privilege extends to statements made prior to the filing of a lawsuit because it is intended to encourage reasonable efforts to resolve disputes prior to the filing of a complaint. The policy behind [the] privilege is to encourage full and candid participation in judicial proceedings by shielding the participant from potential liability for defamation.") (internal quotations omitted); Douglas R. Richmond, *The Lawyer's Litigation Privilege*, 31 AM. J. TRIAL ADVOC. 281, 306 ("An attorney must be at liberty to candidly and zealously represent his client in communications to potential opposing parties in litigation or other proceedings without the specter of civil liability for his

statements clouding his efforts. Were we to accept plaintiff's argument that extending the privilege to communications to others prior to litigation goes beyond the scope of the privilege, we would obstruct more than just an attorney's ability to properly represent his client. Such a limitation on the privilege could frustrate an attorney's ability to settle or resolve cases favorably for his client without resorting to expensive litigation or other judicial processes.") (quoting *Atkinson v. Affronti*, 369 Ill.App.3d 828, 308 Ill.Dec. 186, 861 N.E.2d 251, 255 (2006))

21. Our Superior Court stated in *Denoble v. Dupont Merck Pharm. Co.*, that the privilege "extends to an attorney's communications preliminary to the proceedings" and cited to § 586 of the Second Restatement of Torts for support. *Denoble v. Dupont Merck Pharm. Co.*, 1997 Del.Super. LEXIS 203, at *13 (Del.Super.Apr.11, 1997). But, the communications at issue in *Denoble* were made "during the course of legal proceedings related to Denoble's discharge," and thus this statement was not necessary to the decision. *Id.* The Delaware Supreme Court affirmed the Superior Court decision in a one paragraph order that made no mention of any of the merits of the case. *Denoble v. Dupont Merck Pharm. Co.*, 703 A.2d 643 (Del.1997) (TABLE). Based on my reading of our case law, none of the other Delaware cases that have addressed the absolute litigation privilege have considered the privilege's application to statements made before the commencement of formal judicial proceedings.

22. Def. Pre–Tr. Rep. Br. at 13–15.

tion privilege could apply to statements made outside the judicial process in advance of litigation. This decision simply accepts the question the parties have presented, including the Lerner Fund's assumption for the sake of argument that the absolute litigation privilege can apply to pre-litigation settlement discussions, and does not constitute a holding on whether the absolute litigation privilege applies to communications made in advance of litigation. That should be decided in a context where the merits of that issue are actually contested.

With these principles in mind, I turn to the parties' arguments with respect to the litigation privilege's applicability to the March 2010 Letter, which the Lerner Fund seeks to introduce in order to prove its counterclaim against the Paiges for a breach of their fiduciary duties.

### IV. An Overview Of The Parties' Arguments

Although the parties themselves do not distill their opposing arguments regarding the admissibility of the March 2010 Letter to gin-like clarity in their pre-trial briefing, the following is my distillation of their basic positions regarding the scope of the privilege, and the differing public policy each position embraces.

The Paiges object to the Lerner Fund's planned use of the March 2010 Letter because in their view the March 2010 Letter constitutes a statement made in the course of settlement negotiations, the admissibility of which is barred under both the absolute litigation privilege and Delaware Rule of Evidence 408. In arguing that the absolute litigation privilege bars the introduction of the March 2010 Letter by the Lerner Fund, the Paiges seek to materially expand the scope of the litiga-

tion privilege. The Paiges view the privilege's goal of ensuring freedom of communication as so important that any other interests at stake must be subordinated to the achievement of that goal. In that vein, the Paiges are not satisfied with confining the litigation privilege to its more traditional role of barring the use of litigation-related communications to prove defamation claims, but instead wish to expand the scope of the privilege to prevent such communications from being used to prove *any* tort claim, regardless of whether that tort claim has anything to do with the making of comments that are themselves disparaging to the target's reputation or psychic well-being.

In support of their contention that the absolute litigation privilege bars the March 2010 Letter's introduction into evidence, the Paiges cite cases which, in their view, extend the privilege's reach well beyond actions for defamation.[23] Although most of the cases relied upon by the Paiges are from outside of Delaware, the Paiges argue that extending the litigation privilege to cover not only suits for defamation, but also any suit grounded in tort, would further the valuable public policy of encouraging frank settlement discussions aimed at avoiding recourse to self-help or violence that undergirds the extension of the privilege to certain pre-litigation communications.

The Paiges' argument under Delaware Rule of Evidence 408 is similar. The Paiges contend that the March 2010 Letter, being one that was sent on the eve of litigation and in an attempt to settle their dispute with the Lerner Fund, is inadmissible for proving liability for an alleged breach of fiduciary duty. To that end, the Paiges further argue that courts in Dela-

---

**23.** Pl. Pre–Tr. Br. at 27 (citing *Barker v. Huang*, 610 A.2d 1341, 1345 (Del.1992); *Wol-* *lam v. Brandt*, 154 Or.App. 156, 961 P.2d 219, 222 n. 5 (1998)).

ware will, even when faced with doubt, exclude evidence on the basis of Rule 408 rather than risk subverting the public policy served by Rule 408's existence, the encouragement of the amicable settlement of disputes otherwise destined for the courts.[24]

The Lerner Fund's argument in favor of the March 2010 Letter's admissibility hews more closely to the traditional boundaries of the litigation privilege. Although it does not challenge the Paiges' contention that the March 2010 Letter *could* be protected by the litigation privilege as a communication in advance of contemplated litigation if the Lerner Fund were attempting to use the letter's contents to prosecute a claim for defamation, the Lerner Fund argues that the litigation privilege should not bar the use of the March 2010 Letter as evidence that the Paiges breached their fiduciary duties, a theory of liability that does not in any way depend on the Paiges having made a reputation-damaging false statement about the Lerner Fund or its principals. Specifically, the Lerner Fund argues that although Delaware courts do indeed extend the litigation privilege beyond suits for defamation, they only extend it to similar tort causes of action that have at their core allegations that a statement caused reputational or emotional injury to another.

The Lerner Fund says that because it seeks to introduce the March 2010 Letter into evidence to show an illicit state of mind or plan on the part of the Paiges in order to prove its counterclaim for breach of fiduciary duty, and does not seek to utilize the March 2010 Letter to prove a claim for defamation or other related tort, the litigation privilege does not apply and

the March 2010 Letter should be admitted. That is, the Lerner Fund argues that the public policy supporting the litigation privilege is to promote an open and frank discourse between the parties unhindered by the threat of a collateral suit for defamation or other tort causes of action that have at their core a claim that a party made a derogatory statement; it is not designed to shield parties from the prosecution of legitimate causes of action based on a litigating party's statements or conduct when those statements or conduct are wrongful in their own right and not because they were damaging in a reputational sense. Put more bluntly, the Lerner Fund says that the absolute litigation privilege does not allow someone to threaten to kill someone's dog or injure their family if they do not agree to a settlement demand, and immunize that threat from liability.

As to the Paiges' argument against the admission of the March 2010 Letter grounded in Delaware Rule of Evidence 408, the Lerner Fund again counters that, like the litigation privilege, the critical question is not whether the statement sought to be introduced was or was not made during the course of settlement discussions, but is instead for what purpose the statement is being introduced. To that end, the Lerner Fund argues that because Rule 408 excludes from admissible evidence only statements made during settlement discussions when the statements are offered to "prove liability for or invalidity of the claim or its amount," [25] Rule 408 has no applicability to a situation, as here, when the statement being offered constitutes the actual wrong complained of, i.e., that the Paiges threatened to breach their fiduciary duties unless the Lerner

24. Pl. Pre–Tr. Br. at 23 n. 10 (citing *Candlewood Timber Group LLC v. Pan Am. Energy LLC*, 2006 WL 1382246, at *13 (Del.Super. May 16, 2006)).

25. D.R.E. 408.

Fund acceded to their demands. The Lerner Fund says that Rule 408 has no role to play when the statement made in settlement discussions is being challenged as wrongful in itself rather than being offered to show that the speaker was liable for conduct pre-existing the settlement communication.

## V. The March 2010 Letter Is Admissible To Prove That The Paiges Breached Their Fiduciary Duties

### A. The Policy Rationale Underlying The Privilege Does Not Support Extending Its Scope Beyond Suits For Defamation And Related Torts

■ As so framed, the parties' arguments require me to choose between a more traditional application of the absolute litigation privilege or a broad extension of that privilege in a way that would provide free license to parties to threaten to take future wrongful action if a party does not accede to their settlement demands and to immunize that threat from becoming the subject of a tort suit. I see no reasonable policy basis for such an extension, nor have the Paiges cited any authority that supports such an extreme position. Indeed, there are aspects of existing law that are difficult, if not impossible, to square

with the rule that the Paiges would have me adopt.

■ Before citing some of those provisions, I begin by noting that the Paiges overstate the policy rationale for the privilege. At its core, the privilege is designed to encourage candid and full testimony in court, to have parties resolve their disputes peaceably, to let a result issue, and then move on.[26] Having collateral litigation follow about the defamatory nature or emotionally-injurious effect of testimony in litigation is seen as inefficiently redundant and not, on balance, worth it in light of other existing safeguards promoting truth-telling in the original litigation, and the reality that although coming with the imperfection of any human-made determination, the outcome of the original litigation will tend to suggest which side's version of the truth the fact-finder adopted. This policy balance, which is itself contestable, would be upset by going further and immunizing threats to take future wrongful action if a party does not settle.[27] Rather, the policy rationale for the privilege is best served by limiting the privilege's scope to only defamation and related torts arising from derogatory statements alleged to be harmful to the suing party's reputation or psychic well-being.[28]

26. See, e.g., 86 C.J.S. Torts § 36.

27. Cf. Surace v. Wuliger, 25 Ohio St.3d 229, 231, 495 N.E.2d 939, 941 (1986) ("The late Dean Prosser once noted that '[t]he defense of privilege, or immunity, in cases of defamation does not differ essentially from the privileges, such as those of self-defense, protection of property, or legal authority, available as to assault and battery. It rests upon the same idea, that conduct which otherwise would be actionable is to escape liability because the defendant is acting in furtherance of some interest of social importance, which is entitled to protection even at the expense of uncompensated harm to the plaintiff's reputation.' ") (quoting Prosser, Law of Torts (4th ed.1971) 776, Section 114).

28. But, even as to potentially defamatory statements, the absolute litigation privilege may not always immunize the speaker. Contrast these two situations. In the first, the speaker, an attorney, sends over a draft complaint that the attorney, with a good faith basis, intends to file in court if the parties cannot resolve their differences. In the second, the speaker, a non-attorney, says that he will say false and defamatory things about his adversary outside of the judicial process if the recipient does not settle a festering monetary dispute. In the first situation, there is case law suggesting the privilege would apply. E.g. Restatement (Second) of Torts § 586 (1977) (citing various cases adopting the Restatement view that the privilege applies to pre-litigation communications). In the sec-

As discussed, one public policy goal of the litigation privilege is to allow for, and promote, the candor necessary for full-blooded advocacy, and to encourage witnesses to testify freely in court proceedings without the threat of collateral proceedings sparked by what a witness, in testifying truthfully on the basis of his or her personal knowledge, says.[29] If, for instance, a witness is in fear of being the target of a suit for defamation, that witness' testimony may be compromised by that very fear, an outcome clearly at odds with the truth-finding role of courts in our justice system, and likewise at odds with the policy goal underlying the privilege.

Again, the public policy rationale of the privilege can be seen as an attempt to funnel disputes towards peaceable resolution through compromise or litigation as opposed to promoting the use of violence or self help. Part of that utility is lost if parties cannot exercise that candor in attempts to *resolve* their disputes by *advocating* the superiority of their position. The Delaware Supreme Court's formulation of the privilege's policy rationale im-

plicitly recognizes this by stating that the purpose of the privilege is to "aid in the complete and full disclosure of facts *necessary to a fair adjudication.*" [30]

By seeking to extend this privilege to immunize threats of future wrongful action, the Paiges' position loses sight of the fact that the reason to encourage full-throated advocacy is to facilitate a fair adjudication of the underlying claims.[31] That purpose is hardly served by allowing parties to contemplated litigation, like the Paiges, to use the cover of the privilege to make threats that they will exact revenge if their adversary does not accede to their demands. Although the Paiges may well have been candid when describing the future wrongful action they said they would take if the Lerner Fund did not meet their demands contained in the March 2010 Letter, the absolute litigation privilege was not designed to encourage that type of behavior. In fact, the litigation privilege exists in part to reduce the resort to that kind of unilateral self help and instead promote the peaceful—and legal—resolu-

---

ond, it is difficult to see why the privilege would pertain. SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED PROBLEMS § 8:2.1 ("Pertinent statements made by participants in judicial proceedings, including judges, other judicial officers, attorneys, parties, witnesses, and jurors, are absolutely privileged. The requirement of pertinence is central, at least in most jurisdictions, because such proceedings could otherwise become open forums for the exchange of defamatory statements."); *Kurczaba v. Pollock*, 702, 318 Ill.App.3d 686, 252 Ill.Dec. 175, 742 N.E.2d 425, 438 (2000) ("The privilege is available only when the following conditions have been met: the publication 'was made in a judicial proceeding; had some connection or logical relation to the action; was made to achieve the objects of the litigation; and involved litigants or other participants authorized by law.' ") (quoting 53 C.J.S. *Libel & Slander* § 72, at 132 (1987)).

29. Hayden, *supra* note 2, at 1003.

30. *Barker,* 610 A.2d at 1345 (quoting *Hoover v. Van Stone,* 540 F.Supp. 1118, 1122 (D.Del. 1982)) (emphasis added).

31. In fact, I also note that the Paiges themselves wish to use other evidence from the parties' attempts to resolve their dispute in order to demonstrate that the Lerner Fund was being disingenuous in its negotiations with the Paiges. Pl. Pre–Tr. Br. at 8–12 (outlining the Lerner Fund's "bad faith dealings" with the Paiges); Pl. Pre–Tr. Br. at 18 ("[The Lerner Fund] also dealt with the Paige Parties in such a way as to intentionally deprive them of the protections against instability that were negotiated and made a part of the agreements."). For instance, the Paiges want to use the transcript of a February 17, 2009 meeting between the parties to show that the Lerner Fund was dishonest about its reasons for wanting to withdraw from the Hedge Fund. Plaintiffs' Proposed Exhibit List; Pl. Pre–Tr. Br. at 9.

tion of parties' disputes either through the court system or by mutual agreement.

Here, the Lerner Fund seeks to introduce the March 2010 Letter not in an effort to show that the Paiges made reputationally injurious statements, but instead in order to help prove a distinct claim of wrongdoing on the part of the Paiges, namely that they breached their fiduciary duties owed to the Lerner Fund as an investor in the Hedge Fund. The Lerner Fund's proposed use of the March 2010 Letter, therefore, does not offend the primary policy rationale for the litigation privilege's existence—the encouragement of candid discussions between contentious parties free from the threat of collateral lawsuits based on reputationally based torts such as defamation, libel, or intentional infliction of emotional distress.

The policy rationale for extending the privilege in the manner the Paiges suggest is also weakened by the fact that their statements were not made in an actual judicial proceeding. As is often noted in discussions of the litigation privilege, there are procedures in the litigation process, such as the requirement to take an oath, and the possibility of criminal liability for perjury, that tend to encourage truth-telling and thus diminish the likelihood of the knowing utterance of defamatory statements.[32] Likewise, the dignity of the courtroom setting might be thought to have a dampening effect on threat-making and lying. Similarly, lawyers themselves are subject to Rule 11 and other ethical rules that expose them to sanction for presenting frivolous accusations or knowingly false testimony.[33] Thus, our Supreme Court has clearly limited the absolute litigation privilege to only *relevant* statements.[34] Indeed, as noted, the absolute litigation privilege is venerable, and it has long been the case that outrageous, irrelevant defamatory statements made during judicial proceedings simply to tarnish the opposition in the eyes of the factfinder and larger community are not immunized by the privilege.[35]

Although I am assuming for purposes of this decision that the absolute litigation privilege does extend to pre-litigation com-

32. *E.g.*, Hayden, *supra* note 2, at 1029–36.

33. For instance, Rule 3.3 of the Delaware Lawyers' Rules of Professional Conduct prohibits a lawyer from "knowingly ... mak[ing] a false statement of fact or law to a tribunal or fail[ing] to correct a false statement of material fact or law previously made to the tribunal by the lawyer ...."

34. *See Barker*, 610 A.2d at 1345 ("[The absolute litigation privilege] protects from actions for defamation statements of judges, parties, witnesses and attorneys offered in the course of judicial proceedings so long as the party claiming the privilege shows that the statements issued as part of a judicial proceeding and were *relevant to a matter at issue in the case*.") (emphasis added).

35. For instance, in the mid-nineteenth century New York case *Gilbert v. People*, the defendant was charged with trespass for "entering the close of the plaintiffs and taking and killing divers sheep, and for other alleged injuries to sheep, wool, sheepskins and mutton." *Gilbert v. People*, 1 Denio 41, 44 (N.Y.Sup.Ct. 1845). The declaration in support of those allegations stated that the defendant was "reported to be fond of sheep, bucks and ewes, and of wool, mutton and lambs," and "in the habit of biting sheep," and that if found guilty "ought to be hanged or shot." *Id.* The court found those statements in the declaration to be "in no respect relevant or material to the action" and that they "obviously must have been thrown in to scandalize and annoy the defendant." *Id.* For that reason, the court refused to apply the litigation privilege to bar a claim of defamation based upon those statements, reasoning that "[i]t would be lamentable if irrelevant, gratuitous and malicious attacks could be excused, because inserted in a declaration upon other and distinct causes of action, and with which the vituperative charges had no connection whatever." *Id.*

munications, it is nonetheless instructive that in jurisdictions that have so extended the privilege, the main rationale for the extension is that it allows parties to peaceably resolve disputes in advance of litigation by previewing claims that will be made in good faith in litigation.[36] That rationale does not sensibly apply to immunize statements about future wrongful actions a speaker will take if the recipient does not meet the speaker's settlement demand. Not only would such statements not be made in an environment bounded by the truth-encouraging rules of a courtroom, such statements do not involve what the speaker intends to testify about in court, but rather involve actions the speaker intends to take if the case does not go to court. Moreover, the recipient would not be seeking to hold the speaker liable or accountable for reputational harm because of a defamatory or emotionally injurious statement, but for her threat to take future wrongful action.

■ To this point, it is also relevant that the Paiges have been unable to point to any precedent that supports their argument that threats of future wrongful action are immunized even when made in court. If a witness in court exclaimed from the stand, "settle now and admit that I own that Camaro or I will torch it," would the litigation privilege immunize that statement? Delaware law would suggest not. For instance, under Delaware law it is extortion, a class E felony, for a person to "compel[ ] or induce[ ] another person to deliver property to the person or to a third person by means of instilling in the victim fear that, if the property is not so delivered, the defendant or another will: . . . cause damage to the property."[37] In other words, the law prohibits people from threatening harm to achieve their goals, and the litigation privilege was not designed, nor intended, to shield a party from committing a felony just because that party happened to commit the felony in the course of active or contemplated litigation. The Paiges' argument that the absolute litigation privilege, the roots of which go back to early English common law, immunizes threats made in the settlement process by attorneys is also hard to square with an ethics rule that, although formally repealed, still has resonance. To wit, both the Delaware Lawyers' Rules of Professional Conduct and the American Bar Association's Model Rules of Professional Conduct, on which the Delaware Rules are based,[38] used to explicitly state that a "lawyer shall not present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter."[39] Although that Rule was excised from both sets of rules when they were amended in the mid 1980s, it was not because the absolute litigation privilege made such threats immune from sanction, but because "extortionate, fraudulent, or otherwise abusive threats were covered by other, more general prohibitions in the Model Rules . . . ."[40] Without doing an ex-

36.  See *supra* note 20 and accompanying text.

37.  11 *Del. C.* § 846.

38.  Delaware State Bar Association Comm. on Prof'l Ethics, Op.1995–2 ("The Delaware Rules are based on the ABA's Model Rules of Professional Conduct.").

39.  See ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 92–363 (1992) (quoting former Disciplinary Rule 7–105(A)); Dela-

ware State Bar Association Comm. on Prof'l Ethics, Op.1995–2 (quoting the identical former Delaware Disciplinary Rule 7–105(A)).

40.  ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 92–363 (1992); *see also* Delaware State Bar Association Comm. on Prof'l Ethics, Op.1995–2 (referencing ABA Formal Ethics Opinion 92–363 and agreeing that "DR 7–105(A) was omitted from the

haustive search for other examples, I am confident that it would be unwise to embrace the idea that the law immunizes threats of future wrongful action simply because they were connected to an offer to settle a lawsuit. Such a rule would seem to move more in the direction of lawlessness and violence than toward the peaceful resolution of disputes by non-violent, consensual means. As we shall see, Delaware Rule of Evidence 408 and its federal analog also suggest that wrongful threats made in the settlement process are not immune.

Indeed, it would be a very strange and novel idea that the law would condone a plaintiff in a litigation calling the defendant and threatening to kill his dog if he does not settle the suit simply because that statement took place against the backdrop of litigation, whether active or contemplated.

B. *Delaware Case Law Supports Limiting The Scope Of The Absolute Litigation Privilege To Claims For Defamation And Related Torts*

In the case of *Barker v. Huang*,[41] a defamation case heavily relied upon by both parties in advancing their arguments, the Delaware Supreme Court reaffirmed the litigation privilege's existence in Delaware and arguably expanded the privilege to cover certain related torts other than defamation. The Paiges read *Barker* as support for the proposition that the "absolute [litigation] privilege has been held to be extremely broad,"[42] and applies to tort claims other than claims for defamation. In *Barker*, defendant Huang was sued for defamation, libel, slander, tortious invasion of privacy, wrongful use of civil proceedings, abuse of process, intentional infliction of emotional distress, outrageous conduct, as well as civil conspiracy to engage in each of those torts. Barker's claims were based on Huang's conduct in an earlier related litigation in which Huang defended himself in part by counterclaiming that Barker allegedly conspired with the named plaintiffs in the prior litigation to accuse him of sexual assault. Huang moved for summary judgment claiming that the statements he made in the earlier judicial proceeding were absolutely privileged. Our Supreme Court agreed. *Barker's* extension of the privilege beyond defamation was motivated by a fear that the "privilege would be meaningless if a simple recasting of the cause of action from 'defamation' to 'intentional infliction of emotional distress' or 'invasion of privacy' could void its effect."[43] In other words, the Supreme Court was concerned that clever parties could circumvent the privilege by artfully pleading a claim for defamation as a claim for intentional infliction of emotional distress or invasion of privacy, even though those claims arose out of the same alleged statements or conduct—namely, derogatory statements made in the course of litigation alleged to have been harmful in a reputational or emotional way. In that sense, the decision to expand the privilege in *Barker* still cabined the privilege to those cases in which one party claims that they were harmed by derogatory statements of another in the course of litigation.

There is nothing in that rationale that supports the Paiges' position that the privilege should extend to *all* torts, including a breach of fiduciary duty. Further, since *Barker*, Delaware courts that have addressed the privilege have consistently re-

Model Rules and hence the Delaware Rules because it was redundant and overbroad.").

41. 610 A.2d 1341 (Del.1992).

42. Pl. Pre–Tr. Br. at 27.

43. *Barker,* 610 A.2d at 1349.

ferred to it as relating to defamation or similar torts.[44] The Paiges rely on cases from outside of Delaware, in particular a case from the Oregon Court of Appeals, for their contention that the privilege applies to "any tort action based on statements made in connection with a judicial proceeding." [45] But that case, *Wollam v. Brandt*,[46] also dealt with a defamation claim, and in the footnote to which the Paiges cite for the proposition that the privilege applies to "any tort," the Oregon court cites cases involving intentional infliction of emotional distress and invasion of privacy—i.e., claims related to defamation.[47]

In sum, although the absolute litigation privilege serves public policy goals, including the encouragement of frank and peaceful settlement discussions, those policy goals have no relevance in situations, as here, where a party is seeking to hold a party accountable for statements about the future wrongful actions it intends to take if the listener does not accede to its demands.

## C. *Delaware Rule Of Evidence 408 Does Not Bar The Introduction Of The March 2010 Letter Into Evidence*

Initially, although I have already dispensed with the Paiges' argument with respect to the absolute litigation privilege, I note that if the litigation privilege were extended to cover all torts as the Paiges urge, the privilege's broad scope would render Delaware Rule of Evidence 408 in large part superfluous. Delaware Rule of Evidence 408 tracks the federal rule and deals with the admissibility of evidence related to statements made by parties engaged in settlement discussions.[48] The Rule provides that:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay or proving an effort to ob-

---

**44.** *See, e.g., Hughes v. Kelly*, 2010 WL 3767624, at *7 (Del.Ch. June 30, 2010) (noting with regard to a witness that "[t]he privilege typically operates to bar any cause of action against a witness for defamation or disparagement for statements made in a judicial proceeding...."); *Sunstar Ventures, LLC v. Tigani*, 2009 WL 1231246, at *6 (Del.Super.Apr.30, 2009) ("The absolute privilege is a common law rule, long recognized in Delaware, that protects from actions for defamation ...") (quoting *Barker*, 610 A.2d at 1345); *Sinex v. Bishop*, 2005 WL 3007805, at *4 (Del.Super.Oct.27, 2005) (holding that the privilege applied because "[t]he substantive basis for the third party claims against Gouge

are all the functional equivalent of defamation.").

**45.** Pl. Pre–Tr. Br. at 28 (citing *Wollam v. Brandt*, 154 Or.App. 156, 961 P.2d 219, 222 n. 5 (1998)).

**46.** 154 Or.App. 156, 961 P.2d 219 (1998).

**47.** E.g., *Franson v. Radich*, 84 Or.App. 715, 735 P.2d 632 (1987) (extending privilege to cover claims for intentional infliction of emotional distress); *Lee v. Nash*, 65 Or.App. 538, 671 P.2d 703 (1983) (extending privilege to "false light" claims for invasion of privacy).

**48.** D.R.E. 408.

struct a criminal investigation or prosecution.[49]

■ The bulk of case law in Delaware regarding Rule 408 has been devoted to the Rule's command that what is important for purposes of determining admissibility under the Rule is the purpose for which the evidence in question is being offered.[50] That is, Rule 408 says that evidence of settlement negotiations "is not admissible *to prove liability for or invalidity of the claim or its amount.*"[51] The official comment to the 2006 Amendment to Rule 408 of the Federal Rules of Evidence reinforces the notion that it is the purpose for which the introducing party is offering the evidence that matters, not solely whether the statement was made during settlement discussions. Importantly, the Advisory Committee's comment indicates that the amended language of Federal Rule of Evidence 408 was meant to "retain the extensive case law finding Rule 408 inapplicable when compromise evidence is offered for a purpose other than to prove the validity, invalidity, or amount of a disputed claim" such that, for instance, "Rule 408 is inapplicable if [the evidence is] offered to show that a party made fraudulent statements in order to settle a litigation."[52]

■ Moreover, commentators and courts agree that Rule 408 does not exclude the introduction of settlement-related evidence if the evidence is being introduced to prove a claim arising out of a wrong committed during settlement negotiations. For instance, Wright and Miller conclude with regard to the analogous federal rule that "Rule 408 is also inapplicable when the claim is based upon some wrong that was committed in the course of the settlement discussions.... Rule 408 does not prevent the plaintiff from proving his case; wrongful acts are not shielded because they took place during compromise negotiations."[53] Federal courts have applied this principle specifically to improper threats made by parties during settlement negotiations and found that such threats fall outside the scope of Rule 408.[54]

Because the Lerner Fund wishes to introduce the March 2010 Letter as evidence that the Paiges threatened to breach their fiduciary duties by taking future action if the Lerner Fund did not agree to a multi-

**49.** *Id.*

**50.** *E.g., Sammons v. Doctors for Emergency Servs., P.A.,* 913 A.2d 519, 534 (Del.2006) ("When evidence is offered for another purpose, however, Rule 408 'does not require exclusion of settlement related evidence.' ") (quoting *Capital Mgmt. Co. v. Brown,* 813 A.2d 1094, 1100–01 (Del.2002)); *Grunstein v. Silva,* 2011 WL 378782, at *6 (Del.Ch. Jan.31, 2011) ("Under D.R.E. 408, evidence of an offer in compromise is inadmissible if offered for the purpose of proving or disproving liability with regards to the claim that is the subject of the settlement discussion. Such evidence may be admissible, however, if offered for another purpose.").

**51.** D.R.E. 408 (emphasis added).

**52.** F.R.E. 408 Advisory Committee's Note.

**53.** CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 5314 (3d ed.2008).

**54.** *See, e.g., Uforma/Shelby Business Forms, Inc. v. NLRB,* 111 F.3d 1284, 1294 (6th Cir. 1997) ("We hold that Rule 408 does not exclude evidence of alleged threats to retaliate for protected activity when the statements occurred during negotiations focused on the protected activity and the evidence served to prove liability either for making, or later acting upon the threats."); *Constar Int'l, Inc. v. Ball Plastic Container Corp.,* 2006 WL 6021150, at *1 (W.D.Wis. Mar.27, 2006) ("Rule 408 should not protect improper threats made during settlement negotiations between two businesses.").

million dollar settlement[55] rather than to use the Paiges' offer of settlement to prove their liability for disputed claims pre-dating the communication, Rule 408 does not bar its introduction.

## VI. *Conclusion*

For all these reasons, and consistent with my prior ruling at trial, the Paiges' motion in limine to exclude the March 2010 Letter is DENIED. IT IS SO ORDERED.