## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

FEENIX PAYMENT SYSTEMS, LLC, )
FVP OPPORTUNITY FUND GP, LLC, )
FVP OPPORTUNITY FUND II GP, LLC, )
FEENIX VENTURE PARTNERS )
OPPORTUNITY FUND, LP, FVP )
SMITHFIELD, LLC AND KEITH LEE, )
                     )
         Plaintiffs, )
            v. )       C.A. No. N21C-05-099 EMD CCLD
                     )
MICHAEL BLUM, )
                     )
         Defendant. )

Submitted: October 22, 2021
Decided: January 25, 2022

*Upon Defendant Michael Blum's Motion to Dismiss*
**GRANTED IN PART, DENIED IN PART**

Thomas A. Uebler, Esq., Kathleen A. Murphy, Esq., McCollom D'Emilio Smith Uebler LLC, Wilmington, Delaware, Counsel for Plaintiffs

John A. Sensing, Esq., Jesse L. Noa, Esq., Potter Anderson & Corroon, Wilmington, Delaware, *Counsel for Defendant*

**DAVIS, J.**

## I.     INTRODUCTION

This is a breach of contract and defamation case assigned to the Complex Commercial Litigation Division of this Court. Plaintiffs Feenix Payment Systems, LLC (the "Company"), FVP Opportunity Fund GP, LLC, FVP Opportunity Fund II GP, LLC, Feenix Venture Partners Opportunity Fund, LLP ("Feenix Opp Fund"), FVP Smithfield, LLC, and Keith Lee (collectively, "Feenix")[1] seek relief relating to allegedly defamatory statements in a demand

---

[1] Compl. at ¶¶ 3–9 (D.I. No. 1).

letter sent to their lenders. Feenix contends that Defendant Michael Blum is the party responsible for those statements. Mr. Blum is a former business associate of Feenix.[2]

The Complaint sets out five separate claims for relief. These are: Breaches of Operating Agreement's Restrictive Covenants (Count I); Breaches of Separation Agreement's Mutual Non-Disparagement Clause (Count II); Tortious Interference with Business Expectation (Count III); Defamation (Count IV); and Defamation Per Se (Count V).

Before the Court is Defendant Michael Blum's Motion to Dismiss (the "Motion"). The Motion seeks to dismiss the Complaint under Civil Rule 12(b)(6). For the reasons discussed below, the Motion is **DENIED** as to Counts I and II and **GRANTED** as to Counts III, IV, and V.

## II. BACKGROUND

### A. RELEVANT AGREEMENTS

In 2017, Mr. Blum entered into the Operating Agreement of Feenix Payment Systems, LLC (the "Operating Agreement").[3] The Operating Agreement defined Mr. Blum as a "Restricted Party" who need to abide by various Restrictive Covenants.[4] Under one Restrictive Covenant, Mr. Blum agreed not to

> make any statement, or take any action whatsoever, to disparage, defame, sully, or compromise the goodwill, name, brand, or reputation of any of the Companies or their respective Affiliates.[5]

Under another Restrictive Covenant, Mr. Blum agreed not to

> without the prior written consent of the Board of Managers, directly or indirectly, use, copy or duplicate, or disclose or otherwise make available to any third party, any Confidential Information (as defined below) other than in the performance of such Restricted Party's duties with respect to the Companies . . . [and] not, without the prior written consent of the Board of Managers, utilize or convert Confidential Information for such Restricted Party's own benefit or gain, of whatever nature

---

[2]  *Id.* at ¶ 10.
[3]  *Id.* at ¶ 16.
[4]  *Id.* at ¶ 17.
[5]  *Id.* at ¶ 19.

2

other than in the performance of such Restricted Party's duties with respect to the Companies.[6]

In May 2020, Mr. Blum and Feenix entered into a Separation Agreement.[7] The Separation Agreement provided that the Restrictive Covenants in the Operating Agreement survived the execution of the Separation Agreement.[8] In the Separation Agreement, Mr. Blum also agreed not to

> make any statement, whether orally or in written form, or take any action whatsoever, to disparage or defame any of the Companies, the Company Affiliates or any Company Exculpated Party (as such terms are defined in the Company Operating Agreement).[9]

## B. THE LEASE, LOAN AGREEMENT, AND SALE

In December 2017, PBM Partners LLC and FVP Smithfield entered an office lease for two properties in Pittsburgh, Pennsylvania (collectively, the "Building").[10] PBM was the "Landlord" and FVP Smithfield was the "Tenant."[11] FVP Smithfield added valuable furniture, fixtures, and equipment ("FF&E") to the Building during its tenancy.[12]

In April 2019, Feenix Opp Fund and FVP Smithfield entered into a Loan Agreement with certain Lenders[13] and their administrative agent, Midtown Madison Management LLC.[14] As part of the Loan Agreement, Lenders filed a U.C.C. Financing Statement against debtor FVP

---

[6] *Id.* at ¶ 20.
[7] *Id.* at ¶ 21.
[8] *Id.* at ¶ 22.
[9] *Id.* at ¶ 23.
[10] *Id.* at ¶ 24.
[11] *Id.*
[12] *Id.* at ¶ 25.
[13] The Complaint refers to "Lenders" and "New Lender" without expressly naming either entity. The parties subsequently disclosed their identities to the Court after stipulating to confidential treatment. *See* D.I. No. 27; D.I. No. 28. Because the Court does not regard their identities as material to resolving the pending motion, this opinion will use the labels that Feenix did.
[14] Compl. at ¶ 26.

Smithfield.[15]  The lien covered all FVP Smithfield LLC's assets, including the Building and the FF&E.[16]

Pursuant to the Loan Agreement, Midtown executed a notice of senior security interest in the assets of FVP Smithfield LLC in August 2020.[17]  The notice advised PBM that "this letter constitutes formal written notice to Landlord of Agent's senior secured security interest in the FVP Smithfield LLC's assets.  Landlord is hereby requested not to take any action against it, or institute any proceeding with respect to, all or any part of the FVP Smithfield LLC's assets."[18]  Lenders' attorneys sent the notice to Mr. Blum.[19]

In October 2020, Midtown issued a notice of private sale for the FF&E.[20]  The notice stated that the sale was being held to enforce the rights of the Secured Party.[21]  Subsequently, Feenix Opp Fund purchased the FF&E for $250,000 in November 2020.[22]  Immediately thereafter, Feenix Opp Fund (through Mr. Lee) emailed Mr. Blum to advise him of the sale.[23]

### C. THE DECEMBER LETTER

In December 2020, Mr. Lee was engaged in closing a refinancing deal with Lenders and a New Lender on behalf of Feenix Opp Fund.[24]  On December 16, 2020, Mr. Lee sent an email containing confidential information related to the refinancing to limited partners of Feenix Opp Fund.[25]  The parties anticipated closing on the refinancing deal two days later, on December 18,

---

[15]  *Id.*
[16]  *Id.* at ¶¶ 26–27.
[17]  *Id.* at ¶ 28.
[18]  *Id.* at ¶ 28.
[19]  *Id.* at ¶ 29.
[20]  *Id.* at ¶ 30.
[21]  *Id.* at ¶ 31.
[22]  *Id.* at ¶ 32.
[23]  *Id.* at ¶ 33.
[24]  *Id.* at ¶ 34.
[25]  *Id.* at ¶ 35.

2020.[26] Mr. Lee did not include Mr. Blum on the email; however, Mr. Lee did include three investors in PBM, including Mr. Blum's father, on the email.[27]

On closing date, December 18, 2020, Lenders informed Mr. Lee that they had received a letter (the "December Letter") earlier that day from attorney Jacob S. Frenkel.[28] In the December Letter, Mr. Frenkel stated he represented PBM.[29] Feenix alleges that Mr. Frenkel wrote the December Letter "at the direction of Mr. Blum."[30] Its subject line was "Re: Possible Sham $250,000 Private Transaction and Fraudulent Claim of Security Interest."[31] The December Letter included the following statements:

    a. I write in connection with what appears on paper to be [Lender]'s affiliate Midtown Madison Management LLC / Midtown Management LLC . . . participating in a possible sham $250,000 transaction and fraudulent claim of security interest to defraud PBM.

    b. I characterize the transaction as I do because it is unfathomable that [Lenders], if the transaction in fact is a fraud as it appears, would put the fund and its investors at risk by involving itself in such conduct.

    c. Pursuant to a document captioned Bill of Sale and Assignment bearing the date December 1, 2020, [Lenders] supposedly sold the FF&E at the Leased Premises to Feenix Venture Partners Opportunity Fund, LP . . . for the sum of $250,000. The named signatory on the Bill of Sale is that of [Agent Partner] identifiable on [Lenders'] website as [a Lender] Partner. Regardless of the legal impropriety of selling FF&E owned by another and for which that other party had in place a valid security interest, [Lenders] should have possession, custody and control of a record reflecting receipt on or about December 1, 2020 of a payment of $250,000 from FVP. PBM's suspicion is no such transaction record exists at [Lenders].

    d. And, with respect to the represented sale price of $250,000, the value of the entire FF&E is substantially less than $250,000. This was not a bona fide purchase and sale.

---

[26] *Id.*

[27] *Id.* at ¶ 36.

[28] *Id.* at ¶ 37–38. Feenix does not make the December Letter an exhibit to the Complaint, despite quoting it extensively. The parties subsequently submitted it as a separate filing. *See* D.I. No. 28.

[29] Compl. at ¶ 38.

[30] *Id*.

[31] *Id.*

e. On August 14, 2020, prior to the sale, Holland & Knight, acting for [Lenders], sent a letter to PBM purporting to describe a Loan and Security Agreement dated April 24, 2019 (the "Loan Agreement") between [Lenders] and [FVP] Smithfield (the "August 14 Letter"). According to the August 14 Letter, [FVP] Smithfield granted to [Lenders], through the Loan Agreement, a first priority security interest in all of [FVP] Smithfield's Assets. If such a transaction lacking credulity took place, then it is between [Lenders] and Holland & Knight as to why there was no UCC-1 filing. What matters is that PBM holds a security interest in the FF&E as evidenced by the Lease and [a 2020 Pennsylvania] UCC-1 filing, and the Lease predates [Lenders'] alleged loan to [FVP] Smithfield by over a year. Thus, contrary to the assertions in the August 14 Letter, [Lenders] do[] not have a first priority security interest in the [FVP] Smithfield FF&E. And, [Lenders] and Holland & Knight would be equally culpable for misrepresentations, given that Holland & Knight acted for and with the actual authority of [Lenders].

f. Our suspicion is Lee solicited or induced [Agent Partner] and [Lenders'] participation in this sham transaction and unlawful sale for the sole purpose of harassing PBM.

g. What is shocking, if our suspicion is correct, is the disproportionate legal and regulatory consequence to [Lenders] and [Agent Partner] of [Lenders], as well as Holland & Knight, willingly joining Lee's apparent scheme to defraud PBM. Holland & Knight could not possibly have performed due diligence or complied with Pennsylvania law to advance Lee's scheme and harassment campaign against PBM. If our analysis is correct, then [Lenders] and [their] attorneys impaired PBM's secured property rights and lien, tortuously interfered with PBM's contractual rights and engaged in the tort equivalent of (at a minimum) wire fraud.

h. Please view this letter as both a request to and an opportunity for [Lenders] to provide documentation that would validate what appears to be a sham transaction. A letter or communication without documents will not suffice. Accordingly, please provide confirmatory documents evidencing payment was made specifically for the FF&E per the Bill of Sale, as opposed to some principal repayment to [Lenders] under its credit facility. We view this matter with the utmost urgency; so, I would anticipate that [Lenders] either will provide us with documentation voluntarily and expeditiously or will do so as part of the legal process that PBM has authorized this firm to initiate on its behalf. Therefore, I will presume if I do not receive a reply post haste confirming [Lenders'] willingness to interact promptly with this firm for PBM, I am confident that you will find foreseeable the next steps that PBM will undertake to enforce its rights and hold accountable the participants in the sham transaction.[32]

The December Letter also contained the following statement:

---

[32] *Id.* at ¶ 39.

i. Additionally, we have learned that today, December 18, 2020, [New Lender] is scheduled to replace [Lenders] as creditor for [Feenix Opp Fund]. Investors of PBM, who also are limited partners in [Feenix Opp Fund], are questioning whether the fund [Feenix Opp Find] had any legitimate business purpose in the first place for acquiring used office furniture for a grossly inflated price during a pandemic. Indeed, according to a [Feenix Opp Fund] Summary of Terms for Debt Financing, no equity is attributed to [FVP] Smithfield, notwithstanding that [Feenix Opp Fund] purportedly paid $250,000 for the [FVP] Smithfield FF&E.[33]

Feenix contends that the statements in the December Letter were false and defamatory.[34] Feenix alleges that these statements caused a delay in the refinancing.[35] Additionally, Feenix states that Lenders and New Lender demanded further assurances from Feenix Opp Fund on the threat of future litigation.[36]

Holland and Knight sent a letter criticizing Mr. Frenkel on December 22, 2020.[37] On January 7, 2021, Mr. Frenkel responded in writing.[38] Mr. Frenkel explained that the premise of the December Letter was "dismay that a fund with the reputation of [Lenders] may engage in a highly suspect transaction."[39] Mr. Frenkel also stated that Holland and Knight's response "perpetuate[s] if not elevate[s] the concerns and suspicions" and that "[t]he impression that your client wishes to create of a legitimate transaction continues to strain credulity."[40]

### D. THIS CIVIL ACTION

Feenix filed the Complaint on May 11, 2021. Count I states that Mr. Blum breached the Operating Agreement by (1) "making statements and taking action to disparage, defame, sully, and compromise the goodwill, name, brand, and reputation of the Companies and their respective Affiliates," and (2) "directly or indirectly using, copying, or duplicating, or disclosing or

---

[33] *Id.* at ¶ 41.
[34] *Id.* at ¶¶ 37.
[35] *Id.* at ¶¶ 37, 44.
[36] *Id.* at ¶¶ 45–46.
[37] *Id.* at ¶ 50.
[38] *Id.* at ¶ 51.
[39] *Id.* at ¶ 52.
[40] *Id.* at ¶ 54.

otherwise making available to any third party, Confidential Information other than in the performance of his duties with respect to the Companies and for his own supposed benefit or gain."[41] Count II alleges Mr. Blum breached the Separation by (1) breaching the Operating Agreement and (2) "making statements, whether orally or in written form, and taking action to disparage and defame any of the Companies, the Company Affiliates or any Company Exculpated Party (as such terms are defined in the Company Operating Agreement)."[42]

Counts III–V are tort claims. Count III is a claim for tortious interference with business expectation alleging that Mr. Blum "unjustifiably and intentionally interfered with Plaintiffs' business relationship with Lenders and New Lender."[43] Count IV is a claim for defamation based on the statements contained in the December Letter.[44] Count V also relies upon the December Letter and asserts a claim for defamation *per se*.[45]

Mr. Blum filed the Motion on July 16, 2021.[46] Feenix opposed the Motion. The Court heard argument on October 22, 2021. At the conclusion of the hearing, the Court took the matter under advisement.[47]

### III. PARTIES' CONTENTIONS

Mr. Blum moves to dismiss all five Counts under Rule 12(b)(6). Mr. Blum raises three alternative grounds for dismissal. First, Mr. Blum argues that the December Letter' statements were not defamatory as a matter of law because they were expressions of opinion.[48] Second, Mr. Blum contends that even if the statements in the December Letter were defamatory, Feenix failed

---

41  *Id.* at ¶¶ 57–58.
42  *Id.* at ¶¶ 62–63.
43  *Id.* at ¶¶ 65–69.
44  *Id.* at ¶¶ 70–74.
45  *Id.* at ¶¶ 75–81.
46  D.I. No. 17.
47  D.I. No. 29.
48  Blum's Opening Br. in Supp. of Mot. to Dismiss at 5–11.

to plead adequately that Mr. Blum "published" them.[49]  Third, Mr. Blum claims that even if the statements were defamatory and even if he published them, the statements are non-actionable under the absolute litigation privilege.[50]

In response, Feenix assert that the December Letter's statements were not expressions of opinion but rather claims of fact.[51]  Feenix contends that the Complaint has adequately pled the elements of the tort claims.[52]  Furthermore, Feenix argues the absolute litigation privilege does not apply to the December Letter's statements,[53] and the privilege does not bar the Complaint's contract claims even if the privilege does apply.[54]

## IV.     STANDARD OF REVIEW

A party may move to dismiss under this Court's Civil Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[55]  In resolving a Rule 12(b)(6) motion, the Court (1) accepts as true all well-pleaded factual allegations in the complaint; (2) credits vague allegations if they give the opposing party notice of the claim; (3) draws all reasonable factual inferences in favor of the non-movant; and (4) denies dismissal if recovery on the claim is reasonably conceivable.[56]  The Court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[57]  Nor must the Court adopt "every strained interpretation of the allegations the plaintiff proposes.[58]  Still,

---

[49]  *Id.* at 11–12.
[50]  *Id.* at 12–19.
[51]  Plaintiffs' Answering Br. at 6.
[52]  *Id.* at 18, 22.
[53]  *Id.* at 20.
[54]  *Id.* at 25.
[55]  Del. Super. Ct. Civ. R. 12(b)(6).
[56]  *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 535 (Del. 2011).
[57]  *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018).
[58]  *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

9

even with those cautions in mind, Delaware's pleading standard is "minimal."[59] Dismissal is inappropriate unless "under no reasonable interpretation of the facts alleged could the complaint state a claim for which relief might be granted."[60]

"Generally, matters outside the pleadings should not be considered in ruling on a motion to dismiss."[61] But the Court may consider documents or exhibits outside the pleadings when they're "integral to a . . . claim and incorporated into the complaint."[62]

## V.    DISCUSSION

For the reasons set out below, Court holds that the December Letter's statements fall under the absolute litigation privilege. Therefore, the Court grants the Motion as to the tort claims in Counts III–V because they are based solely on the December Letter. However, the Court denies the Motion as to the breach of contract claims in Counts I and II.

### A. THE ABSOLUTE LITIGATION PRIVILEGE BARS THE TORT CLAIMS—COUNTS III-V.

The absolute litigation privilege "protects from actions for defamation statements of judges, parties, witnesses and attorneys offered in the course of judicial proceedings so long as the party claiming the privilege shows that the statements issued as part of a judicial proceeding and were relevant to a matter at issue in the case."[63] Statements falling under the absolute litigation privilege are privileged "regardless of the tort theory by which the plaintiff seeks to impose liability."[64] The scope of the absolute litigation privilege has expanded over time.

---

[59] *Cent. Mortg.*, 27 A.3d at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 895 (Del. 2002)).
[60] *Unbound Partners Ltd. P'ship v. Invoy Holdings Inc.*, 251 A.3d 1016, 1023 (Del. Super. 2021) (internal quotation marks omitted).
[61] *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 68 (Del. 1995).
[62] *Windsor I, LLC v. CWCap. Asset Mgmt. LLC*, 238 A.3d 863, 873 (Del. 2020); *see also Malpiede*, 780 A.2d at 1083 ("[A] claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law.").
[63] *See Barker v. Huang*, 610 A.2d 1341, 1344–45 (Del. 1992) (internal citations omitted).
[64] *Id.* at 1349.

Traditionally, it applied only to statements made during judicial proceedings.[65]  However, many jurisdictions "have recognized the utility in extending the privilege to cover communications made in advance of anticipated litigation."[66]

The Court recently followed that trend in *BRP Hold Ox, LLC v. Chilian*.[67]  In *Chilian*, the members of an LLC agreed to sell their membership interests to a buyer.  As part of the transaction, the members agreed not to compete with the buyer after the sale and not to disclose any proprietary information.  Afterwards, an executive officer of the LLC left and began working for a competitor.  When the buyer learned this, the buyer sent a demand letter to the officer and his new employer.  The letter requested confirmation of the steps the employer would take to ensure the officer's compliance with his contractual obligations.  Later, the buyer filed an action to enjoin his new employment and recover damages.  When the officer brought tort-based counterclaims relating to the demand letter, the buyer argued they were barred by the absolute litigation privilege.  The Court determined that the absolute litigation privilege should apply to statements "[t]o the extent [they] were made prior to, or during judicial proceedings, so long as the statements were made in an effort to address the alleged grievance between the parties."[68]  Because the buyer sent the demand letter "to address the potential violation of contractual claims between the parties," the Court held that the absolute litigation privilege barred the counterclaims.[69]

The rationale in *Chilian* applies here.  The December Letter explained that it concerned "what appears on paper to be [Lender]'s affiliate Midtown Madison Management LLC/Midtown

---

65    *See Paige Cap. Mgmt., LLC v. Lerner Master Fund, LLC*, 22 A.3d 710, 716–17 (Del. Ch. 2011).
66    *Id.* (internal citations omitted).
67    *BRP Hold Ox, LLC v. Chilian*, 2018 WL 5734648 (Del. Super. Oct. 31, 2018).
68    *Id.* at *3.
69    *Id.* at *3–4.

11

Management LLC . . . participating in a possible sham $250,000 transaction and fraudulent claim of security interest to defraud PBM."[70] The December Letter then detailed PBM's "suspicion[s]"[71] about the transaction. The December Letter concluded by "request[ing]" that Lenders "provide documentation that would validate what appears to be a sham transaction."[72] PBM warned it would take steps to "enforce its rights and hold accountable the participants in the sham transaction."[73] Read in its entirety, the December Letter was a demand letter sent "in an effort to address the alleged grievance between the parties."[74] Accordingly, the absolute litigation privilege protects it.

Feenix attempts to distinguish *Chilian* by arguing the December Letter is not the same type of pre-litigation communication. Feenix explains that "the December Letter was not sent to Plaintiffs; rather, it was sent a third party, Lenders, admittedly in the middle of refinancing, for the express purpose of bringing that refinancing to a standstill."[75] The Court is not persuaded by this argument. The December Letter's "express purpose" was not to halt the refinancing but rather to "request" that Lenders "provide documentation that would validate what appears to be a sham transaction."[76] Requests like this are typical of demand letters. Moreover, the December Letter's would still fall under the privilege even if its senders did hope to sabotage the refinancing. "[T]he protection afforded by the absolute privilege is absolute; so long as the statement is pertinent to, and made in the course of, a judicial proceeding, *even a showing of malice* will not divest the statement of its immune status."[77]

---

[70] Compl. at ¶ 39(a).

[71] *Id.* at ¶¶ 39(c)–(g).

[72] *Id.* at ¶ 39(h).

[73] *Id.*

[74] *Chilian,* 2018 WL 5734648, at *5.

[75] Pls.' Answering Br. in Opp. to Mot. to Dismiss at 21.

[76] Compl. at ¶ 39(h).

[77] *Barker*, 610 A.2d at 1345 (quoting *Hoover v. Van Stone*, 540 F. Supp. 1118, 1122 (D. Del. 1982)) (emphasis in original).

Finally, the Court finds that fact that PBM sent the December Letter to Lenders as seemingly irrelevant.  As the December Letter explained, Lenders were not an unrelated third party.  Rather, Lenders were the party that PBM identified as acting unlawfully with respect to PBM's property.  The Court does not find it extraordinary that PBM sent the December Letter to Lenders.  In any event, Feenix has not cited any authority which suggests that the absolute litigation privilege does not apply to statements directed to third parties.  In fact, this Court has held the opposite.[78]

Because the statements in the December Letter fall within the absolute litigation privilege, they are privileged "regardless of the tort theory by which the plaintiff[s] seek[] to impose liability."[79]  Counts III–V of the Complaint are tort claims based solely on the statements in the December Letter.  Therefore, the Court will grant the Motion as to Counts III–V.

## B. THE ABSOLUTE LITIGATION PRIVILEGE DOES NOT BAR THE CONTRACT CLAIMS—COUNTS I AND II.

The Court will not dismiss Counts I and II.  Mr. Blum argues the absolute litigation privilege requires dismissal of Counts I and II because "both are based entirely on the statements made in the December Letter."[80]  In Mr. Blum's view, Counts I and II impermissibly attempt to "recast[] what is essentially defamation as breach of contract."[81]  The Court disagrees.

Counts I and II are not simply recast tort claims.  Instead, Counts I and II are claims based on obligations by which Mr. Blum contractually agreed to be bound.  "Delaware upholds the freedom of contract and enforces as a matter of fundamental public policy the voluntary

---

[78]  *See DeNoble v. DuPont Merck Pharm. Co.*, 1997 WL 35410094, at *5 (Del. Super. Apr. 11, 1997) (applying absolute litigation privilege to the defendant's allegedly defamatory statement about the plaintiff to non-parties).
[79]  *Barker*, 610 A.2d at 1349.
[80]  Blum's Mot. to Dismiss at 17–18.
[81]  *Id.* at 18.

13

agreements of sophisticated parties."[82] Here, Mr. Blum agreed to the non-disparagement and

confidentiality provisions in contracts. Immunizing Mr. Blum for his alleged breach of those

provisions would arguably disrupt the private ordering of the parties and thus undermine their

freedom of contract. Moreover, non-disparagement and confidentiality provisions are standard

fare in many types of contracts. If the Court were to hold that parties can circumvent these

provisions by filtering their breaches through a lawyer in the context of potential litigation, such

contracts would contain an unforeseen but easily exploited loophole. For these reasons, the

Court believes that Delaware's public policy with respect to contract law must be considered

when deciding whether absolute litigation privilege bars Counts I and II.

The Court of Chancery faced this issue in *Ritchie CT Opps, LLC v. Huizenga Managers

Fund, LLC*.[83] In *Ritchie CT Opps*, the plaintiffs alleged the defendant breached a contractual

non-disparagement agreement through statements in a related litigation.[84] The sole relief the

plaintiffs requested was an order enjoining the defendant from further disparagement.[85] The

Court of Chancery determined that it did not need to answer the question that is currently before

the Court here.[86] Instead, the Court of Chancery determined that "the absolute litigation

privilege, and the public interests behind it, prevent *equity* from specifically enforcing,

prospectively, the contractual non-disparagement clause in the context of litigation."[87] The court

explained:

> Far from vindicating contractual rights, such a use of equity would, in fact, render
> contract rights effectively enforceable. That is, if a breaching party can prevent its
> counterparty, via injunction, from making "disparaging" statements in litigation
> alleging the breach, then the counterparty would be unable to enforce the contract

---

[82]   *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009) (internal citations omitted).
[83]   2019 WL 2319284 (Del. Ch. May 30, 2019).
[84]   *Id.* at *13.
[85]   *Id.*
[86]   *Id.*
[87]   *Id.* (emphasis in original).

14

because it could not effectively prosecute, or even prosecute at all . . . [T]he absolute litigation privilege prohibits (at least) the equitable prohibition of litigation-related utterances, under the rubric of a contractual non-disparagement clause. Such an injunction would impermissibly chill the pursuit of justice via litigation, no less so than permitting analog tort claims in the litigation context.[88]

Accordingly, the Court of Chancery dismissed the non-disparagement claim because it sought only equitable relief.

A similar issue arose in *Sheehan v. AssuredPartners, Inc.*[89] There, the plaintiffs alleged that the defendants breached a non-disparagement agreement by making certain statements in the complaint of a related litigation. Citing *CT Ritchie Opps*, the court determined that "the policy underlying the absolute litigation privilege compels the conclusion that it applies to claims arising in contract as well as in tort."[90] The Court of Chancery explained that the plaintiffs' claim for contractual damages raised the same concerns of potentially chilling litigation that *CT Ritchie Opps* had discussed previously.[91] Furthermore, the court noted that application of a non-disparagement clause to statements in litigation had "potentially never-ending implications," such that trial may become unfeasible.[92] Accordingly, the Court of Chancery held that the absolute litigation privilege barred the non-disparagement claim.

*CT Ritchie Opps* and *Sheehan* appear to be the only Delaware cases that examined the relationship between the absolute litigation privilege and contractual non-disparagement and confidentiality agreements. But neither is exactly on-point. The concern in both cases was that one party might use non-disparagement clauses to prevent the other from effectively litigating its case, and particularly to plead its causes of action. Moreover, both cases extended the absolute

---

[88] *Id.* at *14.
[89] 2020 WL 2838575 (Del. Ch. May 29, 2020).
[90] *Id.* at *16.
[91] *Id.* at *17.
[92] *Id.*

15

litigation privilege to bar non-disparagement claims to eliminate the risk of chilling litigation and the pursuit of justice. Thus, *CT Ritchie Opps* and *Sheehan* stand for the proposition that the absolute litigation privilege will not allow non-disparagement clauses to be used offensively, as a means of gaining an unfair advantage during the litigation process.

This case is different. Feenix does not allege that Mr. Blum breached his contractual duties through any statements he made in pleadings, nor is Feenix attempting to control which statements Mr. Blum may make as he defends this case. Instead, Feenix is seeking damages based on Mr. Blum's alleged breach of his contractual duties in a one-off event from December 2020. In this context, there appears to be no risk that the pursuit of justice would be chilled if Feenix were permitted to pursue the breach of contract claims. But there may be a profound chilling effect if the Court were to hold that the absolute litigation privilege bars those claims. As stated previously, contracting parties frequently rely on non-disparagement and confidentiality provisions to order their private relationships and protect sensitive information. These provisions would lose their utility if parties could circumvent them simply by involving a lawyer in their breach, which may in turn reduce their willingness to contract in the first case.

Under the present circumstances, the Court holds that the absolute litigation privilege does not require dismissal of Count I and II even though the privilege requires dismissal of the tort claims. Mr. Blum is a sophisticated party who consented to the non-disparagement and confidentiality provisions at issue here. If Mr. Blum breached those provisions and the breach caused Feenix damages, then Feenix should be entitled to pursue Counts I and II. To hold otherwise would be to place a common law limit on contractual freedom, and "the common law ought to be especially chary about relieving sophisticated business entities of the burden of freely

16

negotiated contracts."[93]  Instead, the Court will adhere to Delaware's public policy favoring the freedom of contract and hold Mr. Blum to the obligations he decided to assume.

### C. THE ALTERNATIVE ARGUMENTS FAIL

The Motion argues that even if the absolute litigation privilege does not bar Counts I and II, the counts should be dismissed "for the same reason [Feenix] cannot allege defamation against [Mr.] Blum: the statements were not defamatory and were neither made nor published by [Mr.] Blum."[94]  Mr. Blum appears to suggest that he can defeat the contract claims by establishing he did not commit the tort of defamation as a matter of law.  Additionally, Mr. Blum suggests that Feenix has not adequately pleaded that he disclosed confidential information to any third party.[95]  Again, the Court disagrees.

First, the Motion's argument that Mr. Blum did not publish the statements in the December Letter overlooks the full language of the relevant contractual provisions.  Under the Operating Agreement, Mr. Blum agreed not to "make any statement, or *take any action whatsoever*, to disparage, defame, sully, or compromise the goodwill, name, brand, or reputation" of the companies.[96]  And under the Separation Agreement, Mr. Blum agreed not to "make any statement, . . . or *take any action whatsoever*, to disparage or defame" the companies.[97]  Thus, Feenix does not need to plead that Mr. Blum "ma[de] any statement" to establish a prima facie case for breach of either agreement; it is sufficient for Feenix to plead that Mr. Blum "t[ook] any action whatsoever" to harm the reputation of the companies.  Feenix makes such allegations.  In both Counts I and II, Feenix alleges that Mr. Blum breached the

---

[93]   *See Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1061–62 (Del. Ch. 2006).
[94]   Blum's Mot. to Dismiss at 18.
[95]   *See id.*
[96]   Compl. at ¶ 19 (emphasis added).
[97]   *Id.* at ¶ 22 (emphasis added).

17

agreements both by making statements and by acting.[98]  Even if the Court were to accept that Feenix did not adequately plead that Mr. Blum made or published any statements, Counts I and II would survive.

Second, the Motion's argument that Counts I and II must be dismissed because the statements in the December Letter were not defamatory fails for similar reasons.  The Operating Agreement and Separation Agreement did not simply prohibit Mr. Blum from taking action to defame the companies.  The former also prohibited any action to "sully" or "compromise" their reputations, while the latter also prohibited any action to "disparage" them.  The ordinary meanings of "sully,"[99] "compromise,"[100] and "disparage"[101] do not necessarily imply legally actionable falsehoods, like the tort of defamation.  Instead, these ordinary meanings can be reasonably interpreted as referring to any intentional action to harm the reputation of another. Therefore, Mr. Blum could be liable for breaching the agreements even if none of his conduct rose to the level of actionable defamation.

Finally, the Complaint adequately pleads facts supporting a reasonable inference that Mr. Blum disclosed confidential information in breach of the Operating Agreement.  Feenix alleges that Mr. Lee sent an email containing confidential information about the refinancing to Feenix Opp Fund limited partners on December 16, 2020.[102]  Mr. Blum was not one of the recipients, but his father and several investors in PBM were.[103]  Lenders received the December Letter just

---

[98]  *Id.* at ¶¶ 57, 63.
[99]  *Sully*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/sully ("to make soiled or tarnished : defile").
[100]  *Compromise*, MERRIAM-WEBSTER, https://www merriam-webster.com/dictionary/compromise ("to cause the impairment of: to expose to suspicion, discredit, or mischief").
[101]  *Disparage*, MERRIAM-WEBSTER, https://www merriam-webster.com/dictionary/disparage ("to lower in rank or reputation").
[102]  Compl. at ¶ 35.
[103]  *Id.* at ¶ 36.

two days later, on December 18, 2020.[104]  And in the December Letter, Mr. Frenkel wrote that "we have learned that today . . . [New Lender] is scheduled to replace [Lenders] as creditor for [Feenix Opp Fund]."[105]  From these allegations, the Court can reasonably infer that one of the PBM investors provided Mr. Blum with the confidential information contained in the December 16 email.  The Court can, from this, reasonably infer that Mr. Blum disclosed the information to Mr. Frenkel while requesting that he write the December Letter.  The connection between Mr. Blum and the December Letter appears somewhat tenuous, but Delaware's pleading standard is "minimal,"[106] and Feenix has alleged facts sufficient to satisfy it.

Accordingly, the Court denies the Motion with respect to Counts I and II.[107]

## VI.    CONCLUSION

For these reasons, the Motion is **GRANTED** on Counts III–V and **DENIED** on Counts I and II.

Dated: January 25, 2022
Wilmington, Delaware

*/s/ Eric M. Davis*
Eric M. Davis, Judge

cc: File&ServeXpress

---

[104]    *Id.* at ¶ 37.
[105]    *Id.* at ¶ 41.
[106]    *Cent. Mortg.*, 27 A.3d at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 895 (Del. 2002)).
[107]    Mr. Blum suggested that Feenix did not challenge his arguments on Counts I and II in their answering brief, thereby waiving any opposition to them.  Blum's Reply Br. at 10 (D.I. No. 25).  Feenix did respond to Mr. Blum's argument that the absolute litigation privilege bars Counts I and II.  *See* Plaintiffs' Answering Br. at 25.  Feenix also pointed out that Mr. Blum overlooked the contractual language forbidding Mr. Blum not only from making statements, but also from acting.  *See id.* at 25–26.  Finally, Feenix responded to Mr. Blum's argument that the Complaint did not adequately plead that Mr. Blum revealed confidential information to any third party.  *See id.* at 24–25.  The Court finds no waiver.